Bobby E. WILLIAMS,
Plaintiff-Appellee,

v.

HEVI-DUTY ELECTRIC COMPANY,
Defendant-Appellant.

No. 86–5408.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 2, 1986.

Decided May 20, 1987.

Rehearing and Rehearing En Banc
Denied July 7, 1987.

---

Lawrence T. Lynch, argued, Foley and Lardner, Milwaukee, Wis., for defendant-appellant.

William Bush, argued, Rural Legal Services of Tennessee, Cookeville, Tenn., Rich-

ard M. Brooks, Carthage, Tenn., for plaintiff-appellee.

Before ENGEL, KRUPANSKY and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Plaintiff Bobby Williams, a disappointed job-seeker, brought a discrimination action against defendant Hevi-Duty Electric Company under Title VII of the Civil Rights Act of 1964. In the judgment appealed from here, the trial court found that Hevi-Duty failed to hire Mr. Williams because of his race or color (a violation of 42 U.S.C. § 2000e–2(a)) and because he had filed a Title VII charge against Hevi-Duty earlier. (Discrimination against a job applicant for the latter reason would be a violation of 42 U.S.C. § 2000e–3(a).) We have found in the record no evidence that Hevi-Duty's failure to hire Mr. Williams violated the law in either respect. The trial court's conclusions were clearly erroneous, in our opinion, and we shall therefore reverse the judgment.

**I**

Hevi-Duty, a producer of transformers, operates a manufacturing plant in Clay County, Tennessee. In 1980, according to the census of that year, Clay County had a working-age population of 4,422 people. Blacks comprised 1.4% of that number. The number of working-age black males resident in the county was 24. The plaintiff, Mr. Williams, was one of those 24 men.

In February of 1981 Mr. Williams filed a written employment application form with Hevi-Duty. It has been stipulated as "undisputed" that this was the only such form Mr. Williams ever filed directly with Hevi-Duty.

One hundred ninety-eight other applications for employment were filed with Hevi-Duty between January 1, 1980, and May 19, 1982; five were from black people and 192 from white people. The company did not offer Mr. Williams a job, but it did hire a white applicant on August 31, 1981. Business declined, and no one else was hired for more than two years. In March of 1982 Mr. Williams filed a job discrimination charge with the Federal Equal Employment Opportunity Commission. Hevi-Duty settled the charge in October of 1982, paying Mr. Williams $1,800.

The settlement agreement provided that Mr. Williams would "not be penalized in any future considerations [sic] for employment ... because of proceedings arising under the instant charge." The agreement also provided that the settlement "does not constitute an admission by [Hevi-Duty] of any violation of Title VII...." The agreement did not provide that Mr. Williams would be given preferential treatment of any kind.

Other charges of racial discrimination filed against Hevi-Duty in 1982 were dismissed by the EEOC with findings of "no reasonable cause to believe [the allegations of racial discrimination] true."

The Hevi-Duty plant was a popular place to work, and the "Job Services" office operated by the State of Tennessee in the small town of Celina, where the plant was located, maintained a separate file for people who had told Job Services they wanted to work at Hevi-Duty and nowhere else. In January of 1984 there were 100 to 150 names in Job Services' Hevi-Duty file. Most of the individuals in question were white, and most did not have active job applications on file at Hevi-Duty, no such applications having been accepted by Hevi-Duty since May of 1982.

As a result of Mr. Williams' 1982 discrimination charge, it came to the attention of Mr. Don Keith, a Hevi-Duty industrial relations manager based in Goldsboro, North Carolina, that none of the three Hevi-Duty plants for which he was responsible had any policy as to the length of time employment applications would be kept on file. Some of the applications on file at the Celina plant went back to 1974, when the plant was opened. In October of 1982, after Mr. Williams' claim had been settled, Mr. Keith telephoned the managers of the out-of-town plants, including the Celina plant, and told them that employment applications should be retained for a period of one year and then discarded. Mr. Keith

never thought of reducing the policy to writing, he testified, because he did not think the matter weighty enough; he frequently gave plant managers instructions by telephone.

In relaying the new retention policy to the Celina plant manager, whose name is Gerald Block, Mr. Keith mentioned the job application form filed by Mr. Williams in February of 1981 and told Mr. Block to keep that particular application on file for another full year, even though it was already more than a year old. No such consideration was extended to any other applicant who had not worked for Hevi-Duty previously.

Mr. Block repeated the instructions he had received to the office personnel at his plant, telling them that job applications were to be kept on file for one year from the date of the application but that Mr. Williams' application was to be considered active until October of 1983. Like Mr. Keith, Mr. Block saw no need to put the policy in writing; when the policy was adopted, he testified, he was not anticipating a lawsuit.

Like many others who wanted to work at Hevi-Duty's Celina plant, Mr. Williams made it a practice to visit the plant from time to time to check on his application and update it with new information. He made such a visit in August of 1983, talking at that time with Judy Rich, a Hevi-Duty office worker with whom he had gone to high school. As she had done on one or two earlier occasions, Ms. Rich handed Mr. Williams his application, let him update it with whatever he wanted to add, signed and dated it herself, and returned the application to the file.

Early in January of 1984, having heard that Hevi-Duty was going to call five former employees back to work, Mr. Williams went to the plant again and again asked to update his application. The woman to whom he talked on this occasion, Rene Davis, looked through the 25 to 30 job application folders then in her file and could not find one for Mr. Williams. She asked him if it "had been one year," she testified, and either she or Plant Manager Block then told Mr. Williams that they only kept applications for a year.[1] The following conversation ensued, according to Mr. Williams' testimony:

"I told [Plant Manager Block] I was just in six months ago to update [the application.]. He said that didn't matter. I asked him was he taking applications then. They said no. So I just left."

Mr. Williams testified that he did not ask either Mr. Block or Ms. Davis when Hevi-Duty would start accepting applications again.

For several years Hevi-Duty had maintained a written log showing the name of every person from whom a job application had been accepted and the date on which the application was placed on file. The log indicates that no applications were accepted between May 19, 1982, and February 8, 1984. Mr. Williams was correctly informed, however, about the plant's calling back five former employees in January of 1984; business was picking up at this time, and five former employees—whose old job applications were apparently among the 25 or 30 retained by Rene Davis—were re-hired, in order of senority, in January. These men (all of whom were white) had no contractual right to be called back, because they had been in lay-off status for more than one year; Mr. Block had told them he would call them back when he could, however, and he testified that he felt a moral obligation to keep his word. Personnel Manager Keith testified that because of their prior job experience, the former employees could be productive from the outset. Training new people could take as long as four to six months for some jobs, Mr. Block testified.

Because of the improvement in business and a large contract Hevi-Duty was about to obtain, Mr. Block knew, in January of

1. Although Ms. Davis assumed that the application had been discarded, as it ought to have been after October of 1983, the evidence established that Mr. Block found Mr. Williams' application later in the day. Mr. Block considered the application inactive, he testified, and he did not mention to anyone that he had found it.

1984, that his work force would have to be increased. At some point he received a "job prospectus" showing that he would need from 10 to 15 people, but he testified that he did not know how soon the additional people would be needed. When Mr. Block talked to Mr. Williams early in January, he testified, he thought that the five former employees "were going to take care of us."

Working through the local Tennessee Job Services office, plaintiff Williams was able to secure a job at another company, Osh Kosh by name; he started work there on January 23, 1984. He still wanted to work at Hevi-Duty, however, and on January 24 Mr. Williams signed a second equal employment opportunity charge against Hevi-Duty. (Neither Plant Manager Block nor Personnel Manager Keith knew of this charge until February 13, 1984.)

After he had worked at Osh Kosh about two weeks, Mr. Williams heard from his lawyer that Hevi-Duty was hiring through the Job Services office. Mr. Williams went to that office on February 6, 1984, and spoke with a Mr. Bobby Westmoreland. Mr. Westmoreland, who had known Mr. Williams all his life, had been helpful to him in the past; he helped Mr. Williams get a job as a park worker with the Corps of Engineers in 1983, got him certified in January of 1984 under the tax credit program, and referred him to Osh Kosh for the job he had just started. Notwithstanding his new job at Osh Kosh, Mr. Williams told Mr. Westmoreland he wanted to work for Hevi-Duty because he could earn more money there. Mr. Westmoreland advised him that "they're not hiring any right now, but there's a possibility they might." Mr. Williams asked if he could put in an "application" for employment at Hevi-Duty, and Mr. Westmoreland, responding in the affirmative, gave him a Job Service employment form (not a Hevi-Duty form) which Mr. Williams completed and returned to Job Services on February 7, 1984.

The next day, February 8, Plant Manager Block called Mr. Westmoreland at Job Services to say that Hevi-Duty was accepting applications. Mr. Westmoreland understood this to mean that Hevi-Duty would now take job applications from people who came to the plant and filled out Hevi-Duty job application forms. Mr. Block told Mr. Westmoreland that Hevi-Duty would be taking job applications only for the rest of the week—*i.e.*, through February 10, 1984. No one mentioned Mr. Williams, as far as the record shows.

In telling Job Services there was only a three-day window for job applications, Mr. Block was acting on advice from Personnel Manager Keith. Mr. Block testified that he thought only two or three job openings were coming up then (an impression Mr. Keith said he shared), and Keith recommended letting Job Services know the company would be taking applications only from February 8 through February 10. Keith and Block thought they would get plenty of applications within a three day period, and that judgment proved correct.

Hevi-Duty never suggested that plaintiff Williams or anyone else not be told that applications were being accepted, but Mr. Westmoreland made no special effort to contact either Mr. Williams or any of the other 100 to 150 people who, as Mr. Westmoreland knew, wanted jobs at Hevi-Duty. His thinking as to Mr. Williams was that Williams was already working at Osh Kosh, and it was "not part of my job description" to try to get better paying jobs for people who were already working. (Evelyn Bartlett, his superior, testified that in fact it was the policy of the State of Tennessee to aid people who were already employed in getting better-paying jobs. A file memorandum prepared by Ms. Bartlett indicates that it was her "understanding"— obtained, she testified, from "my interviewer in the office" (Mr. Westmoreland?)— that Mr. Williams "has always had a chip on his shoulder"; whether that had anything to do with Mr. Westmoreland's failure to call Mr. Williams would be pure conjecture.)

Instead of attempting to call Mr. Williams or others known to be interested in jobs at Hevi-Duty, Mr. Westmoreland simply told anyone who happened to come into the Job Services office between Febru-

ary 8 and February 10 to apply at the Hevi-Duty plant if he wanted to work there. Mr. Westmoreland testified that he told between five and twenty visitors to his office that Hevi-Duty was "taking applications through the door."

Mr. Block testified that "[i]t's a small town and word of mouth gets around"; no fewer than 34 job applications were received at the plant between February 8 and February 10, 1984. Somewhat to Mr. Block's surprise, as he testified, Mr. Williams' application was not among them.

Most of the 34 applicants were white males, but one (Richard Burris) was a black, and three were females. On the recommendation of Personnel Manager Keith, one of the women, Barbara Breedlove, and the black, Mr. Burris, were hired first. Keith made this recommendation, he testified,

"For Affirmative Action reasons. We have identified in our Affirmative Action Plan that we were underutilizing females and that we could also use additional representation of minorities."

Even after Ms. Breedlove was hired, Mr. Keith thought that females were still under-represented in the hourly work force. Neither of the remaining female applicants was considered qualified, so he told Mr. Block to ask Job Services to refer more females. Mr. Block did so. Mr. Westmoreland denied having complied with this request, which he considered improperly discriminatory, but a second woman, who Mr. Block said was referred by Job Services, applied on February 24 and was hired three days later. She was the only person hired in 1984 who had neither worked for the company previously nor applied between February 8 and February 10.

The need for additional employees continued, for a time, and between February and August of 1984 Hevi-Duty hired a total of 21 people. After Mr. Burris was hired there were two black employees in the hourly wage group, which then consisted of 72 people. No one was hired after August 20, 1984, and some layoffs occurred, but Hevi-Duty still had two black employees—representing over 2.5% of the hourly work force—at the time of the trial in November of 1985.

As a subsidiary of General Signal Company, a large industrial enterprise, Hevi-Duty had affirmative action programs in effect throughout the relevant period. Plant Manager Block testified that he read the various affirmative action plans as they came in, and believed that they said, in essence, "we'll not discriminate against race, creed or color." Mr. Block testified that plaintiff Williams would have been considered for employment had he submitted an application when the company was accepting applications in February of 1984, and the fact that he had filed a discrimination charge would not have affected Mr. Williams' chances of being hired. Block testified that he considered Mr. Williams as qualified as anyone for employment at Hevi-Duty, and he never told anyone to discriminate against Mr. Williams in any way. Office personnel Rene Davis and Judy Rich, Job Services Interviewer Westmoreland, and Personnel Manager Keith all confirmed that there had been no discussion of discriminating or retaliating against Mr. Williams. There is no reason to suppose that if Mr. Williams had tendered a job application between February 8 and February 10, his application—unlike those of the 34 applicants who did so—would not have been accepted.

**II**

On November 15, 1984, the EEOC advised Mr. Williams that the Commission was terminating any further processing of the charge against Hevi-Duty and that Mr. Williams could sue in his own right if he wanted to. A timely complaint was then filed against Hevi-Duty, the State of Tennessee, the State's Department of Employment Security, Mr. Block, and Mr. Westmoreland. The case went to trial before the Honorable L. Clure Morton, sitting without a jury, on November 6, 1985. Many of the facts were stipulated, and the plaintiff rested after offering testimony from himself, Plant Manager Block, office personnel Davis and Rich, and Job Services Interviewer Westmoreland. Hevi-Duty

moved for the entry of judgment in its favor at the conclusion of the plaintiff's case, and the motion was overruled without comment.

The court then heard the testimony of Personnel Manager Keith and Job Services Manager Bartlett, and after very brief rebuttal testimony the court heard argument from counsel and took the case under advisement. In a memorandum opinion filed on March 28, 1986, the court held that the individual defendants and the State and its Department of Employment Security were entitled to be dismissed, but that Mr. Williams was entitled to judgment against Hevi-Duty. The court entered an order awarding Mr. Williams backpay and attorney fees and requiring that he be placed on the Hevi-Duty payroll and be offered the first available position as an hourly employee at the Celina plant. Hevi-Duty has appealed, arguing that the plaintiff's proofs failed to establish a prima facie case of race discrimination and that the trial court's factual findings are not supported by substantial evidence in the record and are clearly erroneous.

### III

As the trial court recognized, the basic question it was called upon to decide was whether the plaintiff had sustained the burden of establishing a prima facie case of disparate treatment. The trial court searched the record diligently for any scrap of evidence that Hevi-Duty had discriminated against Mr. Williams, and this was entirely appropriate; the repeated filing of EEOC charges by Mr. Williams gave the

company an obvious motive to discriminate against Mr. Williams, and the quantum of proof necessary to show that Mr. Williams had in fact been discriminated against was not great. His filing of EEOC charges did not entitle Mr. Williams to preferential treatment, however, and the trial court may have had some difficulty in setting aside the idea that Mr. Williams was entitled to preferential treatment. Questions from the bench frequently have a certain Delphic quality, but the following question, which the trial court posed to counsel for Hevi-Duty during final argument, seems worth quoting:

"If I'd been that company, I'd have called Mr. Williams up on the phone and I'd [have] said look, you haven't applied and you better get up here. We're gonna hire somebody. We know you want a job and you sued us. And we don't want you suing us again. Come on up and apply. *That's what they should have done, isn't it?*" (Emphasis supplied.)

That might well have been a prudent thing for the company to do, but Title VII, by its terms, merely prohibited the company from discriminating against Mr. Williams; it did not require that he be treated more favorably than others similarly situated.[2] As the trial court recognized, moreover, nothing in the 1982 settlement agreement gave Mr. Williams a contractual right to preferential treatment.

The trial court found as a fact that in 1982 Hevi-Duty decided to initiate a one year retention policy for employment applications, and the court recognized that "[t]here is no evidence to indicate that the

**2.** On July 2, 1964, Senator Hubert Humphrey inserted in the *Congressional Record* a "concise explanation of the Civil Rights Act of 1964" in hopes that it might "provide Americans with a short and understandable explanation of the civil rights bill...." 110 Cong.Rec. 15, 865 (1964). Title VII, according to Senator Humphrey,

"does not provide that any preferential treatment in employment shall be given to Negroes or to any other persons or groups. It does not provide that any quota systems be established to maintain racial balance in employment. In fact, the title prohibits preferential treatment for any particular group." 110 Cong.Rec. 15, 866 (1964).

Senator Humphrey's view that Title VII "prohibits preferential treatment for any particular group" has been rejected by the Supreme Court, *Johnson v. Transportation Agency, Santa Clara County, California*, — U.S. —, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), and the state employment agency may have been wrong in thinking that it would be improper to let women alone apply after February 10, 1984. That hardly helps Mr. Williams, however; notwithstanding the tension between the language of Title VII and the holding of *Johnson*, it is evident that neither the statutory law nor the decisional law *required* that Mr. Williams be singled out for favorable treatment.

policy *itself* had an adverse impact on minority applicants different from its effect on white applicants." The court stated, however, that "a number of factors cast grave doubts upon [the one year retention policy's] continued existence and validity."

■ The first of these factors was said to be that "[o]ffice personnel were instructed not to inform applicants of the new policy...." We could find no evidence in the record, however, that any such instruction was given; office personnel simply were not instructed to inform applicants of the new policy, the evidence showed, and that, of course, is a very different thing. Mr. Block testified that he never told the office personnel not to tell Mr. Williams that his application would be inactive after October of 1983, and applicants who checked with the company after more than one year had expired were routinely told, as Mr. Williams was told, that their applications were no longer on file. "If they come in to check," Ms. Davis testified, "we tell them."

■ The court went on to say that: "Pursuant to the policy, applicants who undoubtedly assumed they were in contention for jobs whenever positions became available were to be systematically excluded without notice after one year. Title VII prohibits the selective use of an otherwise valid application process to discriminate against black applicants."

The premise of the first sentence was unproven, and the thought expressed there is unrelated to the fact stated in the second sentence. The record contains no indication that any applicant assumed his application would remain active in perpetuity, and the fact that a number of applicants kept returning to the plant to check on their applications—some more frequently than Mr. Williams—strongly suggests that they entertained no such assumption. Whatever the applicants may have assumed, moreover, the policy systematically excluded from consideration all whose applications were more than a year old, white as well as black. Whether or not the policy ran counter to the assumptions of the applicants, its

systematic application hardly constituted selective use to discriminate against blacks.

■ The court's opinion suggests next that "[t]he policy, if operational at all, was followed haphazardly." It is true, to be sure, that the office personnel who were supposed to destroy inactive applications failed to destroy some, including Mr. Williams', as soon as they should have done; that was simply haphazard housekeeping, however, not haphazard application of the policy. The office workers "testified convincingly as to their instructions when establishing the retention policy," the court said, and the instructions clearly reflected a policy to restrict the pool of potential new-hires to people whose applications were no more than a year old.

The court noted that "[t]he presence of 25 to 30 applications [some or all of which may have been the original applications of former employees] as late as January 1984 [more than one year after Hevi-Duty had stopped accepting new applications] reinforces the court's finding that the retention policy was ... a weapon with which to discriminate." The "weapon," however, was not used; none of the four people hired in February of 1984, and none of the 17 people hired in the months that followed, was hired on the basis of an application more than one year old.

There may have been a departure from the 1982 policy in the case of the five former employees hired in January of 1984, but the trial court acknowledged that because those employees would need no on-the-job training, the company had a legitimate economic reason to limit the application of the one year policy to applicants who had never worked at Hevi-Duty.

■ The only other arguable departure from the policy occurred when Hevi-Duty asked Job Services for female applicants after February 10 and hired a woman (Alma Sutton) who was permitted to apply late. Miss Sutton was given preferential treatment not because of her race, but because of her sex; and the trial court does not suggest that this kind of selective use of the application policy would violate Title VII.

■ Finally, the trial court attached some significance to the fact that the policy adopted in 1982 was never reduced to writing. It may be true, as the court suggested, that an unwritten policy would make it easier for company officials "arbitrarily and selectively [to] enforce an everchanging and unascertainable set of rules," but that is not what they did in the case of Mr. Williams except insofar as they elected to keep his application active longer than the application of anyone else who had not previously worked at the company.

The most significant of the trial court's factual findings is that when Mr. Williams was permitted to update his application in August of 1983, "it became a new application as of that date." The court went on to say this:

"While the plaintiff was allowed to 'update' the original application, he was never told that Hevi-Duty planned to inactivate his application in November of 1983. Naturally, he was led to believe that his application was pending and in line for consideration should openings arise.

\*　　\*　　\*　　\*　　\*　　\*

When the plaintiff supplemented his application in August of 1983, Hevi-Duty was bound to consider the plaintiff for employment through July of 1984. At the time Hevi-Duty hired new workers in February of 1984, the plaintiff's application was 'active.' "

The conclusion that the updating of the application in August of 1983 constituted the filing of "a new application as of that date" seems somewhat difficult to reconcile with the parties' stipulation that "the only written employment application form ever filed by Plaintiff Williams" was filed in February of 1981. Be that as it may, Mr. Williams was not told, in August of 1983, that the company would permit his application to remain active for another full year or for any other length of time. There is no evidence that he was misled in August of 1983. Mr. Williams could not possibly have been under any misapprehension of fact after the beginning of January, 1984, moreover, because the company told him he was no longer in the applicant pool then,

and told him—truthfully—that applications were not being taken at that time. The alleged discrimination did not occur until February, when the company started accepting new applications and hired Miss Breedlove, Mr. Burris, Miss Sutton, and a white male named Edwin Denton.

It was the trial court's impression that 21 people were hired in February of 1984, but the court was in error on this point; only the four people named above were hired in February. Four more new employees were hired in March, two in April, three in May, seven in June, and one in August. Except for Alma Sutton, all 21 had filed applications with Hevi-Duty between February 8 and February 10, 1984.

With the exception of Ms. Sutton, none of the 21 new-hires was given any unfair advantage over Plaintiff Williams in the competition for a job at Hevi-Duty. On February 6, indeed, Mr. Williams may have been better informed than the others, because he had been told by Mr. Westmoreland that although Hevi-Duty was not hiring "right now," there was "a possibility that they might [start hiring]." It was not Hevi-Duty's fault that Job Services failed to notify Mr. Williams when Hevi-Duty started accepting applications on February 8, and the only evidence in the record of any possible animosity against Mr. Williams consists of the memorandum indicating that someone at Job Services thought "he has always had a chip on his shoulder." Job Services was an instrumentality of the State of Tennessee, not an agent of Hevi-Duty.

■ There is no evidence that Hevi-Duty clandestinely informed a few favored individuals that applications would be accepted for a brief period. Hevi-Duty sought referrals from the State of Tennessee's employment service, and had no reason to suppose that the state would discriminate against Mr. Williams, other blacks, females, or anyone else. The decision not to try to notify everyone who had expressed an interest in working at Hevi-Duty was the state's, not Hevi-Duty's.

The trial court charged Plant Manager Block with "a general lack of credibility" because of "his general evasiveness" and a supposed inconsistency between his testimony on a predicted need for 10 to 15 additional employees and his testimony (confirmed by Mr. Keith) that only two or three openings were available when Hevi-Duty accepted applications in February. There are some inconsistencies in Mr. Block's testimony, but this is not one of them. Mr. Block testified that although he knew there was a projected need for 10 to 15 employees, he did not know how many would be needed when. The fact that four people were hired in February instead of the "two or three" Mr. Block initially thought would be needed in that month has little or no significance. Rejection of Mr. Block's testimony, moreover, cannot by itself constitute the affirmative evidence of discrimination necessary to establish a prima facie case.

■ Although none of the 21 people hired between February and August of 1984 was hired without a written job application, and although the company's policy clearly contemplated that new-hires would be drawn exclusively from the pool of people who had filed timely written applications, the trial court concluded that even if the 1983 updating of Mr. Williams' 1981 application did not extend the life of that application to 1984, Mr. Williams' obvious desire to be hired must be considered an "application." We agree that Mr. Williams' desire to be hired was obvious, but neither that fact, nor the fact that Mr. Williams had filed discrimination charges against Hevi-Duty, obligated the company to waive its policy on written job applications for the benefit of Mr. Williams. The number of people eager to work at Hevi-Duty greatly exceeded the number of openings, and the company's job application policy constituted a rational, racially neutral mechanism for limiting the number of prospective employees who would have to be considered. The policy was fairly and consistently applied, except when preference was given to trained former employees and women, and although the company may not have been sorry to learn that application of the policy happened to exclude Mr. Williams from consideration, the company had no way of foreseeing that this would happen; we can see no basis for concluding that the policy was a subterfuge for discriminating against Mr. Williams on account of his race or his litigiousness.

## IV

Because it is clear from the record that Mr. Williams never submitted an application to Hevi-Duty during the time when applications were being accepted, it is equally clear that Mr. Williams did not establish a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the rule of *McDonnell Douglas*, a plaintiff in a Title VII employment discrimination case may be found to have made a *prima facie* case if he shows:

> "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

*Id.* at 802, 93 S.Ct. at 1824. Mr. Williams has shown that he is qualified for the job he wanted and that he is a member of a racial minority and a potential victim of retaliation, but he has not otherwise brought himself within *McDonnell Douglas*. The situation presented here is one in which there was a large pool of potential applicants for a small number of jobs. The employer elected to limit the applications it would accept to those submitted during a relatively short period of time, but there was no showing that this was a device to discriminate on racial grounds; Mr. Williams' application was not rejected, it simply was not timely filed.

The district court suggested that Mr. Williams' "generalized expression of interest may be considered an 'application.'" Over 100 people in Clay County were inter-

ested in working for Hevi-Duty, however, and it cannot fairly be said that everyone who ever expressed interest in working for Hevi-Duty had "applied" to work there. Hevi-Duty was not required to accept applications before it needed new employees, and when it decided to start accepting applications it was not required to seek out all who could be said to have given a "generalized expression of interest" in the past (including people who, like Mr. Williams, had subsequently found work elsewhere) and invite them to apply for work at Hevi-Duty.

In the situation considered in *Ferguson v. E.I. DuPont de Nemours and Co.,* 560 F.Supp. 1172, 1193 (D.Del.1983), it was "impossible" to submit a specific application. Here it was not "impossible" to submit an application; a prospective applicant simply had to find out from the company or the state employment office when applications were being taken, and submit an application during that time period.

The judgment of the trial court is REVERSED, and the case is REMANDED with instructions to dismiss the action.