NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0637n.06

Case No. 18-5392

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Dec 26, 2018
DEBORAH S. HUNT, Clerk

CLAUDE GRANT,                                    )
                                                 )
    Plaintiff-Appellant,                         )
                                                 )
                                                 )    ON APPEAL FROM THE UNITED
v.                                               )    STATES DISTRICT COURT FOR
                                                 )    THE MIDDLE DISTRICT OF
METROPOLITAN GOVERNMENT OF                       )    TENNESSEE
NASHVILLE AND DAVIDSON COUNTY,                   )
TENNESSEE,                                       )
                                                 )
    Defendant-Appellee.                          )

BEFORE: SILER, SUTTON, and WHITE, Circuit Judges.

SUTTON, Circuit Judge. Claude Grant has worked for many years for the combined metropolitan city and county government of Nashville and Davidson County, called the Metropolitan Government or Metro for short. When Grant learned that someone had received a promotion he wanted, he sued, alleging that Metro retaliated against him for filing a Title VII lawsuit. The district court granted Metro's motion for summary judgment. We affirm.

Grant is the Metro Water Services Department's longest-serving employee. He started out as a treatment-plant utility laborer in 1973. Since then, he has obtained a variety of promotions and new positions, developing what by all accounts is unparalleled experience in the maintenance of Nashville's sewer system.

In the early 2000s, Metro's leadership transferred the division that maintained Nashville's stormwater infrastructure from the Public Works Department to the Water Services Department. According to Grant, the director of Water Services told him that he would lead the stormwater division when it became part of the Department. Grant felt qualified for the promotion, as he had once supervised the Water Services crews that maintained the system's stormwater regulators.

Leadership at Water Services, however, changed hands before the restructuring occurred. Around the same time, Grant was transferred to another division in Water Services, where he has worked ever since. When Water Services incorporated the stormwater division a couple years later, Grant told the new head of Water Services that he wanted to manage one of the new division's maintenance sections. At that point, he was told, no jobs were available at his pay grade. Grant has not supervised maintenance crews since his transfer, and he now mainly monitors the sewer system and identifies maintenance needs.

In 2014, Metro combined the stormwater division's two maintenance sections and created a new position to oversee the merged sections. Instead of posting a new vacancy, human resources pulled the list of unsuccessful applicants from a 2013 job posting—a joint recruitment by several other divisions for an engineering position. Metro interviewed five people from this list. Grant did not apply for the earlier posting and so was not on the list. An engineer already working in one of the stormwater division's maintenance sections, Renee Jackson, got the job.

When Grant learned about Jackson's promotion, he filed this lawsuit under Title VII. In particular, he claimed that Metro retaliated against him for filing a Title VII class action against Metro twelve years earlier on the ground that Metro discriminated against black employees by "preselect[ing]" white candidates for job openings. Appellant's Br. 12. Grant played a prominent

role in that litigation, and the mandatory class included all of the other black employees of Water Services (including Jackson). The case settled in 2018.

The district court granted Metro's motion for summary judgment. Grant appealed.

Under Title VII of the Civil Rights Act of 1964, employers may not retaliate against employees for engaging in protected conduct, including participation in Title VII lawsuits or investigations. 42 U.S.C. §§ 2000e–2(a), 3(a). In the absence of direct evidence of retaliation (there is none here), the familiar *McDonnell Douglas* framework provides the path for indirectly proving retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To make out a threshold case of retaliation under Title VII, an employee must show that (1) he engaged in protected activity; (2) his employer knew it; (3) he suffered an adverse employment action; and (4) his protected activity caused the action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). If the employee meets this requirement, the burden shifts to the employer to offer a legitimate, nondiscriminatory explanation, which the employee may rebut as pretextual. *Id.* at 562. In assessing Metro's motion for summary judgment, we ask whether a material fact dispute stands in the way of resolving Grant's case as a matter of law, all while giving him the benefit of reasonable inferences from the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 255 (1986).

Grant's claim has at least two flaws. One, he did not establish a threshold claim of retaliation because he did not suffer an adverse employment action. Two, even if he had done so, he did not show that Metro's ground for hiring Jackson and method for doing so were pretextual.

*No adverse employment action.* To establish an adverse action, the plaintiff must show "that a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Grant did not do that.

Metro had two hiring approaches. Sometimes it posted a vacancy and accepted applications from current employees and the public. The process required human resources to rank the applicants according to the job's requirements and to share the rankings with the department doing the hiring. Other times it used an "eligibility list" procedure. Instead of posting a new position, it used the list of unsuccessful, already ranked applicants from an earlier job posting with similar qualifications for the new opening. Metro used the list procedure with some frequency because human resources had a significant backlog and it could hire people more quickly through the list. Metro used that approach here.

Metro employees were familiar with the list procedure—so familiar that workers often applied for jobs they did not want in order to get on the list for other future jobs. Grant does not deny that he knew about the list procedure. Yet he did not apply for the engineer position in 2013, even though the posting noted that "[a]dditional positions may be filled from this recruitment." R. 57-5 at 36. That meant Grant was not on the list Metro used to fill the stormwater division position.

Even if we treated this hiring practice as informal and excused Grant from the application requirement, he still would need to show that he expressed more than a generalized interest in changing jobs. *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 146–47 (6th Cir. 1989). Grant has not done that. He expressed interest only in working for the stormwater division in other roles, all many years before the position became available. Metro "was not required to seek out all who could be said to have given a 'generalized expression of interest' in the past." *Williams v. Hevi-Duty Elec. Co.*, 819 F.2d 620, 630 (6th Cir. 1987).

*No pretext.* Even if Grant could make out a threshold case of retaliation, Metro has offered a legitimate explanation for its decision: It hired applicants from the list, Grant was not on the list,

and Jackson was the most qualified candidate on the list. The record confirms that the Department hired by the list frequently, that the practice was well known, and that the Department had a reasonable basis for doing so. All of the people that Metro interviewed for this job were on the list from the earlier posting. Of the five candidates, Jackson performed the best in the interview and already had experience in the stormwater division, having already done some of the same tasks the new job would entail.

Grant offers several counterarguments, but none holds water. He suggests that there was a secret job posting that Metro hid from him. But multiple people testified that Metro pulled the five candidates for this position from the eligibility list from the previous posting. The list is in the record, and all of the people that Metro interviewed appear there. In the face of this uncontradicted evidence, it means nothing that two witnesses testified that they could not remember how Metro came to interview these five individuals and that it might have been through a posting. It is no more helpful that Jackson remembered there being a separate posting for this job. What matters is that the Department *hired* through the list procedure, as all of the evidence confirms.

Grant claims that Jackson was "preselected" for the job, and the interview process was a sham. Appellant's Br. 22. As evidence, he points to the sense of one of the candidates that Jackson had a lock on the position even before interviewing. The record contradicts the point. Metro interviewed five people according to its usual process. A panel of interviewers scored the candidates' answers to written questions from human resources and Water Services personnel. Human resources verified the panel's scores and Jackson's was the highest by far. All of the evidence points in the same direction: The most experienced person in this area (Jackson) got the job fair and square.

5

Grant insists that he is more qualified than Jackson and a sufficiently capable writer for a management role. He also insists that an engineering degree is unnecessary for Jackson's job and cries foul that it was not until discovery that Metro crafted Jackson's new job description, which appears to include an engineering degree as a requirement. But even with an engineering degree and impeccable writing, Grant would not have been considered for this position as he was not on the eligibility list. Plus, if Grant is right that an engineering degree is unnecessary for Jackson's job, Water Services was free to prefer an engineer for this position and appears to have had such a preference because it interviewed only engineers who had previously applied for a position that required an engineering degree.

Good reasons backed up this preference. The position entailed supervising design projects and outside contractors on large-scale capital construction. The employees who handled these responsibilities before the new position were hampered by their lack of engineering expertise. Metro's leadership saw Jackson's engineering degree and recent experience supervising capital projects as an asset. In addition to not being on the list, Grant did not fit this profile.

The heart of Grant's claim is that Metro's hiring process was unfair. He was not interested in an "engineer 3" slot in other divisions and this was all the earlier posting advertised. Although the posting stated that future positions could be filled from the same notice, Grant doubtless did not anticipate that Water Services would one day create a job that he *would* be interested in and would happen to fill *that job* from the earlier posting. That is all quite unfortunate but not retaliation.

We affirm.