**Dr. Marie ROOS, Plaintiff,**

v.

**Dr. Herman B. SMITH, Jr., Individually, as past Interim President of Jackson State University; Dr. James E. Lyons, Sr. in his official capacity as President of Jackson State University, Dr. Johnnie Mills–Jones, individually and in her official capacity as Dean, School of Education, Jackson State University, Dr. Anita H. Hall, individually and in her official capacity as Chair, Department of Curriculum and Instruction, Dr. Everette L. Witherspoon, individually and in his official capacity as Vice–President for Academic Affairs, Jackson State University and Frank Crostwhait, Nan Baker, Will Hickman, Sidney Rushing, Ricki Garrett, J. Marlin Ivey, James Luvene, Diane Miller, Dr. Cass Pennington, J.P. Mills, Carl Nicholson and William Crawford in their official capacities as members of the Board of Trustees of State Institutions of Higher Learning and Jackson State University, Defendants.**

Civ. A. No. J92–0663(L)(C).

United States District Court,
S.D. Mississippi,
Jackson Division.

Sept. 27, 1993.

---

Dennis Horn, Horn & Payne, Jackson, MS, for plaintiff.

Maudine Eckford, Miss. Atty. Gen.'s Office, Jackson, for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

On October 19, 1992, plaintiff Marie Roos brought this action pursuant to, *inter alia*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983, alleging that defendants terminated her employment as a professor at Jackson State University in retaliation for her having exercised her right to free speech under the First Amendment of the United States Constitution.[1] She sought injunctive and declaratory relief, as well as monetary damages. Contemporaneously with the filing of her complaint, Dr. Roos separately moved for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure requesting that the court enjoin defendants to maintain her employment as a professor at Jackson State at the beginning of this school year, which was scheduled for August 23, 1993. On August 13, 1993, a hearing on Dr. Roos' motion for preliminary injunction was held before the court at which extensive testimony and documentary evidence was presented. Based on the evidence adduced at that hearing, the court entered an order on August 19, 1993 granting plaintiff's motion for preliminary injunction and ordering defendants to maintain her employment.

During the hearing on the preliminary injunction motion, the parties represented to the court that they were at that time presenting most, if not all, of their evidence pertaining to the merits of plaintiff's claim. Consequently, the court advised and the parties agreed that the evidence submitted at that hearing would be considered by the court in reaching its decision on the merits of this case. Subsequently, on September 17, 1993, the case came on for trial on the merits

and at that time, the parties were given an opportunity to present any additional evidence they deemed relevant to the issues presented.[2] Based on the evidence adduced at the preliminary injunction hearing and the supplementary proof introduced at the trial on the merits, the court makes the following findings and conclusions.

## MOTION TO DISMISS

On August 9, 1993, prior to the referenced hearings, defendants moved to dismiss Dr. Roos' complaint on various grounds. They argued as follows: (1) Plaintiff's action, as well as any relief sought in the action, is barred by the Eleventh Amendment; (2) As to plaintiff's claim for damages against defendants in their individual capacities under § 1983, defendants have qualified immunity; (3) Plaintiff's claim that defendants violated her rights under the First Amendment cannot be maintained against defendants in their individual capacities since the First Amendment proscribes only actions by states and not by private parties; (4) As to plaintiff's Title VII claim, defendants Smith, Mills–Jones, Hall and Witherspoon, in their individual capacities, are not proper defendants as they are not "employers" within the meaning of Title VII; (5) Plaintiff has not alleged a viable claim of conspiracy against defendants under § 1985(3); and (6) Plaintiff is precluded from maintaining a § 1983 based upon the same conduct which is alleged as the basis of her Title VII claim. As to these matters, the court concludes as follows.

The Eleventh Amendment bars judgments under § 1983 against the state, or agencies or instrumentalities of the state, where such judgments would be paid out of the state treasury. Consequently, neither Jackson State, the Board of Trustees for Institutions of Higher Learning (IHL) nor

---

1. Plaintiff named as defendants Dr. Herman B. Smith, Jr., individually, as past Interim President of Jackson State University; Dr. James E. Lyons, Sr., in his official capacity as President of Jackson State University; Dr. Johnnie Mills–Jones, individually and in her official capacity as Dean of the School of Education at Jackson State University; Dr. Anita H. Hall, individually and in her official capacity as Chair of the Department of Curriculum and Instruction at Jackson State University; Dr. Everette L. Witherspoon, individ-

ually and in his official capacity as Vice–President for Academic Affairs at Jackson State University; Jackson State University; and each of the members of the Board of Trustees of State Institutions of Higher Learning in their official capacities.

2. On September 21, 1993, the court entered an order consolidating the preliminary injunction hearing with the trial on the merits.

the individual defendants in their official capacities can incur monetary liability under § 1983.[3] However, the Eleventh Amendment does not bar claims for prospective injunctive relief under § 1983. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Nor does it operate to bar a judgment for money damages against the individual defendants in their individual capacities, unless the defendants, in their individual capacities, enjoy qualified immunity. With respect to plaintiff's claim under Title VII, the Supreme Court has held that state defendants are not immune under the Eleventh Amendment from money judgments for back pay. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (Congress empowered to amend Title VII to require state entities guilty of discrimination to pay back pay).

■ Defendants Hall, Mills–Jones, Witherspoon and Smith, in their individual capacities, argue that they enjoy qualified immunity from suit, both under § 1983. Qualified immunity arises only where an official's conduct does not violate clearly established federal rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It can hardly be reasonably contended that a state employee's right under the First Amendment to speak on matters of public concern is other than clearly established, and defendants agree that this is the case. Essentially, though, defendants maintain that they had reasonable grounds to believe that their conduct was lawful since they could reasonably have believed that their only consideration in non-renewing Dr. Roos was the need for the School of Education to meet NCATE standards. In other words, defendants reasonably believed their conduct was lawful because they believed they non-renewed Dr. Roos for reasons other than that alleged by Dr. Roos. Patently, defendants' argument goes directly to the merits of plaintiff's allegations in this case. And, if plaintiff were to prove her allegations as to the reason for her non-renewal, defendants would have no qualified immunity.[4] If she were to fail to prove her allegations, defendants would have no liability.

■ Defendants Smith, Mills–Jones, Hall and Witherspoon, in their individual capacities, contend additionally that they are not "employers" within the meaning of Title VII and that consequently, plaintiff's Title VII claim against them in their individual capacities must be dismissed. The court agrees, *see Davis v. State Dept. of Health,* 744 F.Supp. 756 (S.D.Miss.1990), and concludes that plaintiff may not proceed against these defendants under Title VII.

■ Though their argument on this point is not clear, defendants appear to contend that plaintiff's conspiracy claim against them in their official capacities under 42 U.S.C. § 1985(2) must be dismissed since defendants, in their official capacities, are, in effect, the University and since the University, as a single entity cannot conspire with itself. On this issue, defendants' motion is well taken. *See, e.g., Hankins v. Dallas Indep. School Dist.,* 698 F.Supp. 1323 (N.D.Tex.1988) (school administrative officials acting within scope of duties constitute single legal entity which cannot conspire with itself); *Barger v. Kansas,* 620 F.Supp. 1432 (D.Kan.1985) (university officials could not conspire in their official capacities for purposes of § 1985(3)). The individual defen-

---

3. As defendants correctly point out, the Board of Trustees of State Institutions of Higher Learning and Jackson State University are agencies of the state, and their respective officials are officials of the State of Mississippi for Eleventh Amendment purposes. *See Jagnandan v. Giles,* 538 F.2d 1166 (5th Cir.1976). (Mississippi State University is agency of State of Mississippi and University officials acting in official capacities acted as agents of state); *see also Bruner v. University of Southern Mississippi,* 501 So.2d 1113 (Miss. 1987) (University of Southern Mississippi is agency of State of Mississippi).

4. Defendants Smith, Mills–Jones, Hall and Witherspoon, in their individual capacities, also argue that plaintiff's complaint under § 1983, predicated on a violation of the First Amendment, cannot be maintained since the First Amendment applies only to actions by states and not by private parties. And, inasmuch as all actions taken by these defendants were taken in their official capacities as University employees, plaintiffs cannot incur liability under § 1983 in their individual capacities. This argument is, likewise, without merit. Unless they enjoy qualified immunity for their actions, these defendants may be subjected to individual liability under § 1983.

dants further argue that, as to any claim by plaintiff that they, in their individual capacities, conspired in violation of § 1985(2), plaintiff's claim must be dismissed for failure to sufficiently allege facts which would support a finding of conspiracy. To sustain a claim of conspiracy, plaintiff is required to show the following: (1) a possible motive, i.e., shared purpose; (2) minimal contact between defendants; and (3) the actual nature of the information conveyed. As the court's discussion *infra* of the merits of plaintiff's claim indicates,[5] there has been evidence presented that would substantiate a claim of conspiracy by two of the individual defendants, Dr. Anita Hall and Dr. Mills–Jones.[6] As to the remaining defendants, however, there is proof only that they approved a recommendation that Dr. Roos' contract not be renewed. There is no proof that they knew, or even should have known, of the reason that Dr. Roos was recommended for non-renewal. Consequently, plaintiff has demonstrated no factual basis for a claim of conspiracy by these individuals.

■ Defendants finally contend that plaintiff's claim under § 1983 claims is precluded by her Title VII claim. The court, however, concludes otherwise. *See Wilson v. UT Health Center,* 973 F.2d 1263, 1268 (5th Cir.1992) (Title VII does not preempt collateral § 1983 action based on same incident).

Having now addressed defendant's motion to dismiss, the court now proceeds to consider the merits of plaintiff's claims.

## ANALYSIS

The plaintiff in this case, Dr. Marie Roos, is a sixty-year-old white female who was hired by Jackson State in August 1990 as a full professor in the Department of Curriculum and Instruction in Jackson State's School of Education. As a non-tenured professor at Jackson State, Dr. Roos' contract of employment was subject to renewal on a yearly basis and, after an initial contract for the 1990–91 school year, Dr. Roos signed two more one-year contracts for the 1991–92 and 1992–93 school years. However, in May 1992, she was notified that her contract would not be renewed for the 1993–94 school year. In this action, Dr. Roos alleges that defendants terminated her employment from Jackson State because of her participation as a witness in a Title VII race discrimination and retaliation lawsuit filed against the University by another white professor, Dr. Bettye R. Langley, *Dr. Bettye R. Langley v. Jackson State University,* Consolidated Case Nos. J86–0206(L) and J90–0038(B). Dr. Roos testified by deposition in the *Langley* case in January 1991 and later testified on behalf of Dr. Langley at the trial of the case in January 1992. In her deposition and trial testimony, Dr. Roos identified problems she had encountered during her tenure at Jackson State, and in particular, conflicts with the head of her department, Dr. Anita Hall, which Dr. Roos attributed, at least in part, to her race. Dr. Roos further expressed her general perception that whites were unwelcome at Jackson State. On April 13, 1992, this court rendered its decision in the *Langley* case. Dr. Roos received notification on May 11, 1993, less than a month later, that her contract of employment would not be renewed and would expire at the conclusion of the 1992–93 school year.[7]

■ As a non-tenured professor, Dr. Roos had no right or entitlement to continued employment at Jackson State and thus could have been terminated or non-renewed at any time, for any reason or no reason at all, unless the reason for that action infringed

5. Since the court has received all of the evidence relative to plaintiff's claim, there is no need for the court to confine its analysis of the sufficiency of this claim to the allegations of the complaint.

6. As to these two defendants, proof of a "conspiracy" avails plaintiff nothing, as the court concludes, *infra,* that they may be subject to individual liability for their actions in any event.

7. Under Jackson State's policies, a non-tenured professor who has been employed by the University for two or fewer years must be given at least six months' notice of non-renewal. A professor who has been employed three or more years must receive twelve months' notice. Though she was hired by the University in August 1990 and hence had been with the University less than two years when the decision not to renew her contract was made, she was given twelve, rather than six months' notice of her non-renewal and consequently, she remained on the faculty of Jackson State for a full academic year following notice of her non-renewal.

her constitutionally protected interests, including her interest in freedom of speech. In this case, the parties agree that Dr. Roos' testimony in the *Langley* case amounted to free expression, protected under the First Amendment. Consequently, defendants would be liable if, in fact, Dr. Roos' having testified in the *Langley* case was a "substantial" or "motivating" factor in the decision to terminate her employment or not to renew her contract of employment. *See Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). As would be expected, however, the parties disagree as to the reason for defendants' decision not to renew Dr. Roos' employment.

Dr. Roos claims, obviously, that the decision to terminate her, which followed closely on the heels of this court's decision in *Langley,* was made because she gave testimony in favor of Dr. Langley and against Jackson State in that case. The University, on the other hand, insists that there were valid reasons, completely unrelated to Dr. Roos' First Amendment expression, that prompted her termination. Specifically, Jackson State claims that it non-renewed Dr. Roos in order to make room for the School of Education to hire a professor with qualifications that would enable the school to secure accreditation of its doctoral program in Early Childhood Education by the National Council for Accreditation of Teacher Education (NCATE). For a variety of reasons, the court is unable to credit Jackson State's stated reason for Dr. Roos' non-renewal. More to the point, the court is persuaded, based on the totality of the evidence, that Jackson State's decision to terminate Dr. Roos was motivated by her having testified in the *Langley* case and that its claim that it terminated Dr. Roos to move into a position for securing NCATE accreditation is merely a pretext for its true reason.

The court recognizes that the fact that Dr. Roos was notified only a few months after she testified in *Langley* and less than a month after this court's decision in *Langley* that she would not be renewed could be coincidental. The timing of the termination is relevant, but considered alone, proves little. When coupled with other facts, however,

it takes on added significance. That is to say, in reaching its conclusion, the court is influenced by a number of factors, only one of which is the fact that Dr. Roos was terminated immediately after the *Langley* case concluded in this court. This brings the court to consideration of Jackson State's proffered reason for deciding to non-renew Dr. Roos.

The decision to recommend Dr. Roos for non-renewal was made initially by Dr. Anita Hall, a professor of elementary education at Jackson State and who was, from the fall of 1988 to June 11, 1993, Chair of the Department of Curriculum and Instruction in which Dr. Roos was employed. In her testimony before the court during the preliminary injunction hearing, Dr. Hall explained her decision. According to Dr. Hall, her department offered a degree in early childhood education, and was one of very few departments at Jackson State which offered a doctoral degree. Dr. Hall testified that in order to secure accreditation by NCATE for that doctoral program, the department was required to have a specific number of faculty members—three—with a doctoral degree in early childhood education. Dr. Hall stated that the composition of the faculty in her department did not satisfy this requirement and therefore, when the School of Education began to focus on meeting NCATE accreditation, she had to devise some means by which to acquire faculty members with the requisite degree. Initially, according to her testimony, she attempted to secure approval of additional personnel through Dr. Johnnie Mills–Jones, Dean of the School of Education. In January 1992, Dr. Mills–Jones, consistent with Dr. Hall's request, made a request of Dr. Everette Witherspoon, Vice–President for Academic Affairs, for funding for more faculty members. When that request was ultimately denied in April 1993 due to a lack of money, Dr. Hall was forced to consider alternatives. That is, she had to look internally to find someone to terminate so that the department could hire someone with the appropriate qualifications, i.e., a doctoral degree in early childhood education. The only available "resources," according to Dr. Hall, were professors in the department who were

non-tenured, and there were only two: Dr. Roos and Dr. Leroy Kemp.

Dr. Hall explained in her initial testimony that in choosing between these two, she considered the kinds of skills and service each brought to the department and the students, as well as the activities each engaged in with students. Ultimately, she determined that while both professors were proficient in instruction, Dr. Kemp was more valuable to the School of Education. He was involved in preparing students for the National Teacher Examination (NTE),[8] and was active in publishing articles and in securing other faculty members in the School of Education to co-author articles for publication. Because Dr. Kemp had more to offer, Dr. Hall selected Dr. Roos for non-renewal and, in accordance with University policy, recommended to Dr. Mills–Jones that Dr. Roos' contract not be renewed. Dr. Mills–Jones, in turn, made that recommendation to Dr. Witherspoon, who passed it along to Dr. Herman Smith, then president of Jackson State, and the Board of Trustees of Institutions of Higher Learning, which approved the non-renewal of Dr. Roos.

While on its face, this explanation by Dr. Hall seems plausible, when considered and examined more carefully in light of all the evidence presented, it does not withstand scrutiny. The first factor which, in the court's view, tends to undermine Dr. Hall's explanation in her testimony at the preliminary injunction hearing is her deposition testimony in this case. When asked during her deposition why she made the decision to recommend that Dr. Roos' contract not be renewed, Dr. Hall recited, as she did in her testimony at the preliminary injunction hearing, that the decision was made "[f]or the needs of the department at this time and meeting NCATE standards for the early childhood education doctorate degree." However, when asked specifically why Dr. Roos was chosen for non-renewal rather than Dr. Kemp, Dr. Hall responded immediately that the "secondary rationale for [her] decision between the two persons" was that "Dr. Roos is not a very supervisable person." [9] She reiterated this reason throughout her deposition, though she was careful to note that NCATE standards, and not Dr. Roos' lack of supervisability, was the primary rationale for her decision not to renew Dr. Roos' contract. In response to specific questioning in her deposition concerning Dr. Kemp's qualifications as a "team" member, versus those of Dr. Roos, Dr. Hall referred to Dr. Kemp's volunteer work. But the emphasis of her testimony, in marked contrast to her at the preliminary injunction hearing, was firmly on Dr. Roos' shortcomings (her lack of supervisability) rather than on Dr. Kemp's contributions. The contrast between Dr. Hall's deposition testimony and her testimony at the preliminary injunction hearing is all the more interesting in light of her testimony at the September 17 trial. Dr. Hall was, once again, asked to explain the reason for her choice of Dr. Roos for non-renewal rather than Dr. Kemp and at that time, she offered an angle on her non-renewal decision which, despite ample opportunity, had not previously been mentioned. At trial, Dr. Hall again described Dr. Kemp's outstanding contributions to the department and his support of students, and explained that whereas Dr. Kemp's efforts were aimed at promoting the students, the department and the University, Dr. Roos' efforts "were to personally promote Dr. Roos, the person." [10] The divergence in Dr. Hall's statements on each of the

---

8. Dr. Hall maintained on direct examination that Dr. Kemp did this work with students voluntarily. On cross-examination, though, she admitted that this work was actually part of Dr. Kemp's assigned duties. That is, Dr. Kemp was assigned the task of working with students in preparation for the NTE and for this work, he received a one-hour reduction in his course load.

9. She expounded on this statement in the following way:

Dr. Roos often takes, if recommendations, suggestions are made, it has been my personal experience with her that things are taken out of context, things are distorted, information is half provided when she returns, and just a compatibility within the team framework. I found it very difficult.

10. Dr. Hall complained that Dr. Roos, unlike Dr. Kemp, did not make herself available for students and instead, came in only to teach her classes and leave.

occasions that she has testified in this cause place her testimony, on the whole, in doubt.[11]

A further factor which influences the court's decision in this case concerns the testimony of Dr. Hall and Dr. Mills–Jones relating to the "projected needs" of the Department of Curriculum and Instruction which are claimed to have led to the need for Dr. Roos' termination. Under the accreditation standards of NCATE, as read by Dr. Anita Hall and Dr. Johnnie Mills–Jones, a doctoral program must have at least three full-time faculty with doctorate degrees in early childhood education before it can receive accreditation for its doctoral program.[12] It is uncontroverted that at the time the decision was made not to renew Dr. Roos, there were no faculty members in the Department of Curriculum and Instruction holding doctoral degrees in early childhood education. However, Dr. Hall explained that though she needed three persons with doctorates in early childhood education in order to meet NCATE standards, she only needed to open up one position or "line" to fill the Department's needs. The death of another faculty member, Dr. Boyne Coates, in January 1992, had given her one slot which she could fill with someone appropriately qualified. And Dr. Hall hoped to have Dr. Gladys Johnson, a professor in the Special Education Department who had the requisite degree, transferred to her department. According to Dr. Hall, Dr. Roos' position was vacated as the third of the three positions needed to fulfill NCATE standards.

Like Dr. Hall, Dr. Mills–Jones testified that in order for the School of Education to receive NCATE accreditation of its doctoral program in early childhood education, three faculty members with doctorates in early childhood education were needed. There were none on the faculty when she first focused on the NCATE standards so she set about the task of securing the appropriate faculty. However, Dr. Mills–Jones' testimony concerning her specific plans for securing the appropriately degreed faculty differed from that of Dr. Hall. Dr. Mills–Jones explained that while she had requested approval of five new positions for faculty in the School of Education in January 1992, she received approval for only two. Of those two, she planned to use one for an early

11. The court notes that in their brief in opposition to plaintiff's motion for preliminary injunction, defendants asserted that "[a] decision as to which faculty was based on looking at non-tenured Ph.D. positions, with a decision being made as to Dr. Roos because of lack of interpersonal skills and relationships, supervisability, and lack of academic support of students." These were not the reasons given at the preliminary injunction hearing or at the trial. And, in their supplementary proposed findings and conclusions, submitted after the conclusion of the trial, defendants asserted that plaintiff was chosen for non-renewal because "Dr. Kemp was a team player who promoted the Department and the School of Education while plaintiff only promoted herself." Again, this reason was not among those given in Dr. Hall's earlier testimony.

12. The parties dispute whether NCATE standards actually require that Jackson State have three professors with terminal degrees in early childhood education as a prerequisite for accreditation of its doctoral program in early childhood. NCATE Standard 77 states that there must be:
  sufficient numbers of faculty, including cooperating teachers and other field-based supervisors, to support programs offered by the unit. Each advanced degree program leading to the doctorate has at least three full-time faculty who have earned the doctorate in the field of specialization for which the degree is offered.
It would thus seem to impose such a requirement. However, Dr. Roos maintained that NCATE standards do not require doctoral degrees in early childhood education by three faculty members but rather, the standard may be met by faculty persons who have terminal degrees in a *related* area with an *emphasis* in early childhood education. And there is evidence to support this position. Testimony was elicited from Dr. Hall that at a time after she made the decision to non-renew Dr. Roos, she received information from an NCATE staff person that a terminal degree in early education was not mandated by NCATE standards. Dr. Hall maintained, though, that at the time she made the decision to non-renew Dr. Roos, she did not have the benefit of this interpretation and that she, in any event, felt she was bound by what the standard said and could not rely on some unofficial interpretation of the standard. While there is certainly evidence to support Dr. Roos' position concerning the requirements of NCATE, the court need not resolve this dispute for, in the court's opinion, even if NCATE did require terminal degrees in early childhood education by faculty members, that was not the basis for the University's decision to discharge Dr. Roos.

childhood education professor.[13] That gave her one of the three slots she needed. The second she planned to acquire by transferring Gladys Johnson into the Department of Curriculum and Instruction. But she still needed one more faculty person with a terminal degree in early childhood education and therefore, she instructed Dr. Hall to look within her department at the faculty resources as they currently existed to find a way to meet this need. Ultimately, according to her testimony, Dr. Mills–Jones did not participate in Dr. Hall's decision to recommend Dr. Roos for non-renewal. She simply received and endorsed Dr. Hall's recommendation that Dr. Roos be terminated so that a slot would be available for hiring the needed additional faculty member with a doctorate in early childhood education.

Dr. Hall's testimony that Dr. Boyne Coates' death provided the first needed opening appears to contrast with that of Dr. Mills–Jones, who stated that the first slot came from the approval of a new line which she intended to fill with someone from outside the University with the requisite doctoral degree. Dr. Mills–Jones did not indicate that she considered the opening left by Dr. Coates' death, whereas Dr. Hall, in contrast, indicated that *no new lines* were approved which could be filled with someone with the needed degree. If, in fact, a new line was approved which was to be utilized for hiring someone with the requisite doctorate, and if, in fact, Dr. Coates' death provided a second open position, and if, in fact, it was planned that Dr. Johnson be transferred into the Department of Curriculum and Instruction, then there would have been no need to terminate Dr. Roos.

The court would observe that both of these witnesses did agree that one of the faculty members that was to count toward meeting the NCATE standards was to be Gladys Johnson, whom Dr. Mills–Jones planned to transfer from the Special Education Department to the Department of Curriculum and Instruction. Yet despite the professed "ex-treme" and "urgent" need in the Department of Curriculum and Instruction for persons with early childhood education doctorates, Dr. Johnson was not transferred, as allegedly planned, and was instead, at her request, relieved of the obligation to transfer and allowed to remain in special education because she complained to Dr. Mills–Jones of harassment of some sort. Even taking into account that Dr. Johnson may have complained of some perceived harassment, it seems odd, indeed, that Dr. Hall or Dr. Mills–Jones who, because of their urgent need for personnel would deprive one professor of her job altogether, would not insist that another professor simply transfer to another position to fill their need.[14] This, too, tends to suggest that the reason offered for terminating Dr. Roos is contrived.

The fact that Dr. Roos was hired in August 1990, and was terminated less than two years later tends, as well, to cause the court under the circumstances to view with suspicion defendants' contention that Dr. Roos was terminated because of the "projected needs" of the School of Education. That is, the court perceives no rational basis for concluding from the evidence in this case that the projected needs of the department would or should have changed in the short time between the date of Dr. Roos' employment and the date she was informed that her employment was to terminate.

First, there is no question but that Dr. Mills–Jones and Dr. Hall were aware, at the time Dr. Roos was hired in August 1990, that the degree programs offered in the School of Education, including the doctoral degree program in early childhood education, were to be submitted for NCATE accreditation in the not-too-distant future. And it is undisputed that the position which Dr. Roos was hired to fill was a tenure-track position. Yet these witnesses would have this court believe that the needs of the School of Education, and the Department of Curriculum and Instruction in particular, "changed" after she was hired,

13. The other she intended to use for a position in educational administration.

14. The court would note that the nature of the "harassment" claimed by Dr. Johnson was not identified and further, that there has been no suggestion that any consideration was given to attempting to address and alleviate the alleged harassment.

thus necessitating her termination. It is uncontroverted, however, that there was no "change" in NCATE standards as they pertained to faculty requirements for doctoral degree programs. And though references have been made to "changes" in the composition of the faculty due to deaths, transfers, etc., the court is unable to discern how these "changes" affected the "needs" of the Department or how these "changes" made necessary the termination of Dr. Roos or any other faculty member.

It is the court's recollection that Dr. Mills–Jones testified before this court in the *Langley* case that one of the primary reasons she was hired by the University to h³ad the School of Education was her experience with NCATE standards and review. The University, when she was hired in 1987, was intent at that time on achieving NCATE accreditation and she was viewed as someone who could help advance that goal. Indeed, there was extensive testimony concerning the fact that the doctoral program in early childhood education, due to perceived deficiencies in the program particularly relating to faculty, had not been "put up" for review by NCATE when NCATE had earlier conducted a review at Jackson State. Thus, as early as 1987, Jackson State was aware that specific efforts would be made to secure NCATE accreditation. In 1992, five years later, even though it appears that no significant progress had otherwise been made toward meeting NCATE's requirements (at least in the area of faculty composition), Dr. Roos was fired, allegedly to open a slot for someone with qualifications that would satisfy NCATE standards. No satisfactory explanation has been provided the court as to why defendants hired Dr. Roos in the first place, if indeed Jackson State wanted to secure the coveted

NCATE accreditation and was ultimately willing to fire Dr. Roos to get it.

Dr. Mills–Jones suggested on one hand that she hired Dr. Roos not necessarily to fill a specific need of the department, but rather simply to fill a slot so that she would not lose an open slot to another department. But it is uncontroverted that Dr. Roos' position was a tenure-track position. Furthermore, there is no question but that Dr. Mills–Jones was aware of NCATE's faculty standards in 1990 when she hired Dr. Roos. If the University was motivated by its desire to meet NCATE standards, then it had that motivation in 1990 and nothing in that regard actually changed after that time.[15]

Nor have there been such changes in the composition of the faculty in the Department of the Curriculum and Instruction as would indicate any need to non-renew Dr. Roos. Dr. Mills testified that when the decision was made to non-renew Dr. Roos, the School of Education had a faculty "surplus" in the area of language and reading arts, and she named a number of professors qualified in that area, including Dr. Joyce Harris, Dr. Hall and Dr. Evelyn Leggett. But that surplus must also have existed when Dr. Roos was hired, as the testimony from this trial and the *Langley* trial shows that each of those professors was on the faculty at Jackson State when Dr. Roos was hired. This would certainly tend to suggest that Dr. Mills–Jones did not consider that Dr. Roos was "surplus" when she was hired. Moreover, Dr. Mills–Jones specifically testified that when she hired Dr. Roos, she considered the fact that "reading [was] coming back to the forefront," and she believed that in hiring Dr. Roos, she was looking to the future. She testified additionally that when she hired Dr. Roos, she be-

15. There has been testimony, particularly by Dr. Jones–Mills and Dr. Hall, that the School of Education did not actually begin to focus on NCATE accreditation until approximately the 1990–91 school year and was prior to that time involved in attempting to secure accreditation by the Southern Association of Colleges and Schools (SACS) and that SACS standards are different, i.e., less stringent, than NCATE standards. But if, in fact, NCATE standards are as exacting as defendants suggest, then it would seem that a program designed to meet NCATE standards would likewise satisfy SACS requirements.

SACS, for example, required that the doctoral faculty include one person with a doctoral degree in the area of the offered degree, and additional faculty members with degrees in related fields. Surely, though, a doctoral degree in the degree field would qualify as a degree in a related field. Thus, it is difficult to conceive how efforts to devise or refine a program for the purpose of meeting NCATE requirements would not have been unavailing in the SACS review. In any event, it is apparent that NCATE was a matter of some concern for the University long before Dr. Roos was hired.

lieved that Dr. Roos' degree would support the doctoral program in early childhood education because of the content area, i.e., reading and language arts. This testimony clearly belies her suggestion that Dr. Roos was merely hired to keep a slot available for future use.

Furthermore, though in May 1992, well over a year ago, a decision was made that Dr. Roos would no longer be on the faculty of Jackson State after May 1993, as of the date of the preliminary injunction hearing in this cause, no one had been transferred to or hired by the Department of Curriculum and Instruction with a doctoral degree in early childhood education. Again, despite the alleged urgent need for such personnel, Dr. Gladys Johnson was not made to transfer to the department. And the position left open as a result of Dr. Coates' death in January 1992, a year and a half later, remained unfilled. And though Dr. Mills–Jones testified that a new position was allocated to the department in May 1992, still no one was hired for that position. Though two persons from outside the University with doctoral degrees in early childhood education have now been hired, their hiring was not finalized until after the preliminary injunction hearing.[16]

With respect to the present composition of the faculty, it is also of note that a professor who was already on the faculty at Jackson State, Ophelia Kelly, graduated on August 1, 1993 from Jackson State with a doctorate degree in early childhood education. But Dr. Kelly was sent to Southern Illinois University for this 1993–94 academic year for additional training and thus, according to Dr. Mills–Jones, cannot be counted as one of the three faculty persons necessary to fulfill the NCATE standard requirements (even though presumably she will return the following year).[17] Consequently, even though two persons have been hired, the department still has a need for a third professor with a doctoral degree in early childhood education.[18] One must wonder, then, what was accomplished by the non-renewal of Dr. Roos.

In addition to the foregoing, it is of interest that since the decision was made not to renew Dr. Roos, Dr. Leroy Kemp's position was vacated in January 1993 as he was awarded the position of Director of Research in the University's Center for Excellence. And though he no longer holds his teaching position, no consideration has been given to filling his position with Dr. Roos. When first queried at the preliminary injunction hearing concerning the status of Dr. Kemp's former position, Dr. Mills–Jones stated that the position cannot be filled but must be kept open for Dr. Kemp since he has the option of returning to his former position at the conclusion of his directorship, which is a five-year position. On cross-examination, however, she then stated that Dr. Kemp's position can be filled, but that she has decided to "restructure" the position and fill it with someone with a social science degree with an emphasis in multi-culturalism and ethnicity, though she concedes that such restructuring is not required to satisfy NCATE standards. Although the eventuality of Dr. Kemp's vacating his teaching position transpired after Dr. Roos was notified of non-renewal, the court makes reference to this merely to make this point: Had Jackson State non-renewed Dr. Roos to open a position, Dr. Kemp's transfer accomplished that result. And, given that no one had been hired or had joined the Department of Curriculum and Instruction with the required doctoral degree as of the date of Dr. Kemp's transfer, it would certainly have been reasonable, if defendants' proffered reason were the true reason for its actions, to utilize Dr. Kemp's slot, rather

---

16. There was testimony at trial that no one was immediately hired to fill the position vacated by the termination of Dr. Roos because until Dr. Roos' position was actually vacated, funding was not available to hire a new professor. However, while this may be so, it still does not explain why other vacancies were not filled when they became open.

17. NCATE review is scheduled for the 1994–95 school year.

18. Since Dr. Hall has recently resigned as head of the department, Dr. Mills–Jones testified that she hopes to fill this third position by hiring as the new chair someone with a doctorate in early childhood education.

than Dr. Roos', for that purpose. Yet no consideration was given to that possibility.

Though all of the foregoing provides substantial support for the court's conclusion that Dr. Roos was not terminated because of any alleged need to meet NCATE standards, there is additional compelling evidence that the basis for her termination or non-renewal was her having testified in the *Langley* case. This evidence was provided by Dr. ReJohnna Brown, a professor of elementary education in the Department of Curriculum and Instruction at Jackson State. Dr. ReJohnna Brown was and is a close friend of Dr. Bettye Langley and, like Dr. Roos, provided deposition testimony in Dr. Langley's case which was unfavorable to Jackson State. Dr. Brown testified at the preliminary injunction hearing that after Dr. Langley filed her lawsuit against Jackson State, Dr. Brown encountered what she perceived was harassment and intimidation over trivial matters from her superiors. The problems intensified after she gave her deposition, and she perceived that certain actions taken with respect to her by Dr. Mills–Jones, in particular, were "mean-spirited." While Dr. Brown's testimony before the court in this proceeding was confusing in many respects, in one respect it was clear. Dr. Brown testified that in the course of a dispute with the administration concerning the downsizing of her office,[19] she overheard Dr. Hall state to Dr. Mills–Jones on the telephone, "She didn't have to go down there and spill her guts to the court." On this point, Dr. Brown's testimony was credible[20] and, coupled with the remainder of the evidence in this case, supports Dr. Roos' position that her participation as a witness in Dr. Langley's case was a motivating factor in the decision that her contract of employment with the University not be renewed.

19. Dr. Brown felt that her office was being downsized in retribution for her participation in Dr. Langley's case.

20. Though in their trial testimony, both Dr. Hall and Dr. Mills–Jones denied that this conversation occurred, they did not so testify at the preliminary injunction hearing, despite the clear opportunity to do so.

The court previously enjoined defendants to maintain Dr. Roos' employment as a full professor in the Department of Curriculum and Instruction and that relief remains appropriate. Additionally, evidence submitted by Dr. Roos at the trial of this cause established that as a result of Jackson State's failure to employ her during the summer session of 1993, she sustained damages in the amount of $2,486.48.[21]

### CONCLUSION

Based on the foregoing, it is ordered that plaintiff be reinstated to her job and all its rights and privileges. Further, it is ordered that plaintiff is entitled to recover the sum of $2,486.48.[22]

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ORDERED.

21. Dr. Hall testified that had she remained as chair of the department, Dr. Roos would, in all likelihood, have been employed for the summer school session.

22. Though Dr. Roos has requested damages for emotional distress and punitive damages, in the court's opinion, such an award is not supported by the evidence.