**Wendy Lee WILSON, et al.**

v.

**WAYNE COUNTY, et al.**

No. 1–92–0148.

United States District Court,
M.D. Tennessee,
Columbia Division.

May 24, 1994.

John S. Colley, III, Colley & Colley, Columbia, TN, for plaintiffs.

William Stuart Fleming, Fleming, Holloway & Flynn, Columbia, TN, James Y. Ross, Lackey, Lackey & Ross, Waynesboro, TN, for defendant Wayne County, Tenn.

James Y. Ross, Lackey, Lackey & Ross, Waynesboro, TN, for defendant Wayne County Sheriff's Dept.

William Gary Blackburn, Blackburn & Slobey, P.C., Nashville, TN, George G. Gray, Waynesboro, TN, for defendant Leon "Buddy" Nutt.

## MEMORANDUM

HIGGINS, District Judge.

This is a Title VII sexual harassment and retaliatory discharge action brought by Wendy Lee Wilson and Stevie Burns. Ms. Wilson alleges that Leon "Buddy" Nutt, the sheriff of Wayne County, Tennessee, sexually harassed her while she was working as a dispatcher for the Wayne County Sheriff's Department. Mr. Burns alleges that Sheriff Nutt fired him from his job as a deputy sheriff in retaliation for opposing the harassment of Ms. Wilson.

The plaintiffs originally sued Wayne County, the Wayne County Sheriff's Department, and Sheriff Nutt. They subsequently settled their claims against Wayne County and the Wayne County Sheriff's Department.[1] Thus, when this case came to be tried, only Sheriff Nutt remained as a defendant.

Now, having heard all the evidence, the Court finds that Sheriff Nutt did sexually harass Ms. Wilson and that he did terminate Mr. Burns in retaliation for opposing this harassment. Nevertheless, the Court concludes that Title VII does not permit suits against individual defendants in their individual capacities. Accordingly, the Court shall dismiss this action with prejudice.

1. Prior to the settlement, there was some uncertainty as to whether the Wayne County Sheriff's Department was an entity subject to suit. However, the settlement has obviated the need to address this question.

2. Although the Court concludes that this action must be dismissed, the Court nevertheless makes findings of fact in case the action should be reinstated on appeal. It is better to make findings of fact now, while the subtleties of the live testimony are still fresh in mind, rather than try to recall the events of trial many months later.

## I. Findings of Fact.[2]

Wendy Lee Wilson is twenty years old. At age eleven, she was abducted in Wayne County, Tennessee, and raped. Her attacker was arrested, and he is still in prison. In the spring of 1992, Ms. Wilson began working as a dispatcher at the Wayne County Sheriff's Department. She was still a senior in high school and planned to go away to college in the fall. The sheriff's department hired her with the understanding that she would leave her position on July 31 to attend college.

Leon "Buddy" Nutt is fifty-five years old. He was elected Sheriff of Wayne County in 1990. When Ms. Wilson began working at the sheriff's department, Sheriff Nutt knew that she had been raped. He remembered the incident from the time it happened. He also discussed it with another sheriff's department employee, to whom he expressed his belief that Ms. Wilson was emotionally disturbed as a result of the rape.

Stevie Burns is thirty-three years old. He has worked for the Murray Ohio Manufacturing Company for fifteen years. In October, 1990, he began working part-time as a volunteer "auxiliary officer" for the Wayne County Sheriff's Department. In October, 1991, he was added to the sheriff's department payroll. See defendant's exhibit D-1 (sheriff's department payroll records). Mr. Burns started off as a dispatcher and warrant server. However, over time, he assumed the duties of a deputy sheriff.[3] In order to remain in a law enforcement position at the sheriff's department, Mr. Burns had to attend training at the Tennessee Law Enforcement Academy within one year of being hired. Sometime in the spring of 1992, Mr. Burns learned that Tom Rinehart would be hired as a new sheriff's deputy. Sheriff Nutt

This is especially true in this case, where important live testimony was in conflict, and the Court must assess the credibility of witnesses, in part, on the basis of their demeanor on the stand.

3. The payroll records list Mr. Burns as a "part-time deputy," with the exception of the November, 1991 records, which list him as a "dispatcher/deputy." Mr. Burns's annual salary of $12,-000 was higher than that of other dispatchers but lower than that of other deputies. See defendant's exhibit D-1.

assured Mr. Burns that he would still be going to the Law Enforcement Academy in August or September and told him to "get his papers together." This meant, in part, that Mr. Burns should go for a psychological examination, which he did in June.

During 1992 and 1993, the number of sheriff's department employees frequently changed. Excluding the sheriff but including his chief deputy, there were fifteen or more employees on the payroll for twenty weeks in each of 1992 and 1993.[4] Excluding the sheriff and the chief deputy, there were fewer than fifteen employees for twenty weeks in either 1992 or 1993. *See* defendant's exhibit D–1.

The sheriff's department employees had differing opinions about Ms. Wilson's demeanor at work. The cook, a fifty-seven-year-old woman, thought Ms. Wilson dressed inappropriately. She recalls Ms. Wilson wearing shorts that revealed her buttocks. Other sheriff's department employees do not remember Ms. Wilson dressing inappropriately. The supervising dispatcher only recalls that Ms. Wilson "wore blue jeans a lot." The cook once complained to her superiors that Ms. Wilson and a young male dispatcher had engaged in "horseplay." An informal investigation was conducted, but there was no confirmation of any misconduct. Ms. Wilson and the other young dispatcher did occasionally engage in innocent hijinks, but they never kissed or touched each other in a sexual manner. On one occasion, Ms. Wilson stopped by headquarters on the way back from a canoe trip wearing a one-piece bathing suit and shorts. Sheriff Nutt was not present, but several employees saw her in this attire and observed that her breasts were visible through the bathing suit. At some point during the summer, Ms. Wilson and Mr. Burns became intimate. They had sexual relations in late May or early July.

On July 4, Ms. Wilson had an automobile accident that caused substantial damage to her car. She determined that she would be unable to afford to repair the car if she went away to college. Therefore, she asked Sheriff Nutt if she could stay on as a dispatcher after July 31. The sheriff responded that she could not remain as a full-time dispatcher because her replacement had already been hired. However, he added there was a strong possibility that she could continue to work part-time and that he would "think about it."

On July 13, at approximately 1:30 in the morning, Sheriff Nutt arrived at headquarters. He went into the dispatch room, where Ms. Wilson was on duty, and the two engaged in conversation. The sheriff told Ms. Wilson about a video he had rented, and they talked briefly about the sheriff's son, who was a friend of Ms. Wilson. They also talked about Ms. Wilson's plans for college and how they had been affected by her automobile accident. Ms. Wilson again indicated that she hoped the sheriff would let her continue working in the fall. After Ms. Wilson mentioned that she was nearly out of complaint-cards, the sheriff got up and went to his office. He returned shortly and asked Ms. Wilson to join him in the office.

Ms. Wilson followed Sheriff Nutt into his office believing that he was going to show her where he kept the complaint-cards. The sheriff locked the door behind them and turned out the lights. Ms. Wilson was very surprised by the sheriff's actions, and she froze in fear. The sheriff then kissed her and put his hand on her breast. Ms. Wilson said nothing and did not resist. The sheriff then put his hand on Ms. Wilson's crotch, and he took her hand and placed it on his own crotch. Still Ms. Wilson did not resist or tell the sheriff to stop, but she did withdraw her hand once he was no longer holding it against him. Sheriff Nutt then unzipped Ms. Wilson's jump-suit and told her to get on the floor. Ms. Wilson just stood there, until the sheriff pulled her down to the floor. The sheriff penetrated Ms. Wilson on the office floor. Afterwards, he told her not to tell anyone what had just taken place.

---

4. No evidence was presented at trial regarding the duties of the chief deputy. Sheriff Nutt has argued that the chief deputy should not be counted as an employee because he serves on the sheriff's "personal staff." *See* 42 U.S.C. 2000e(f) (person chosen by an elected official to serve on the official's "personal staff" is excluded from Title VII's definition of "employee"); *see also* memorandum (entered September 16, 1993; Docket Entry No. 47) at 4–6.

Sheriff Nutt never threatened Ms. Wilson, nor did he explicitly offer her any reward, such as continued employment, in exchange for sexual favors. The sheriff's son was asleep in the living quarters, just a few yards from the office, during the entire time Ms. Wilson and the sheriff were inside. Had Ms. Wilson called out, the son would have heard.

Ms. Wilson believed she was being raped. However, she did not resist because she thought it would be futile. She had tried to resist when she was raped at age eleven but to no avail. Therefore, she thought it would be useless to resist against the sheriff.[5]

After the incident in the sheriff's office Ms. Wilson returned to the dispatch room. Sheriff Nutt went to his bed and fell asleep.

At approximately 2:00 a.m., Ms. Wilson called Stevie Burns at his home and told him that the sheriff had just raped her. From his home, Mr. Burns called his supervisor, Sergeant Charles Crosslin, to report what he had been told. Mr. Burns then drove to the sheriff's department headquarters. He talked with Ms. Wilson and asked whether she wanted to file charges against Sheriff Nutt. Ms. Wilson replied that she wanted to file charges, and Mr. Burns telephoned an assistant district attorney to report her allegations. He then telephoned another sheriff's department employee to procure a rape-detection-kit. Mr. Burns also called another dispatcher to fill in for Ms. Wilson. He then drove her to the hospital. Witnesses who saw Ms. Wilson in the early morning of July 13 observed that she was crying; her hair was disheveled; and she appeared distraught.

Wendy Wilson never returned to work at the sheriff's department after the events of July 13. She was paid her ordinary wages through July 14. *See* plaintiff's exhibit P–1

(final paycheck stub). If Ms. Wilson had been paid through July 31, the day she originally planned to leave work at the sheriff's department, she would have earned an additional $396.42.

Stevie Burns was beginning a period of family leave on July 13 because his mother had just been diagnosed with cancer. Sometime between July 13 and July 22, Mr. Burns appeared under subpoena before the Wayne County Grand Jury, which was investigating Ms. Wilson's allegations of rape.[6] On July 22, the day Mr. Burns returned to work, he was discharged. His separation notice described the reason for his discharge as "budget restrictions." *See* plaintiff's exhibit P–2 (separation notice). Mr. Burns was not given a choice of staying on as a dispatcher. As of July 22, there were five dispatchers on the payroll with less seniority than Mr. Burns.[7] No other sheriff's department employees were laid off in the summer of 1992 for lack of funds.

Since being discharged from the Wayne County Sheriff's Department, Mr. Burns has applied for work with other law enforcement agencies, but he has not obtained a position. He continues to work at the Murray Ohio Manufacturing Company. Had Mr. Burns continued working at the sheriff's department through March 15, 1994, the final day of trial, he would have earned an additional $19,250 in wages. If he continued to work through August 31, 1994, the last day of the sheriff's current term, he would have earned another $5,500 in wages.

Tom Rinehart first applied for a position in the Wayne County Sheriff's Department in August, 1990. *See* defendant's exhibit No. 5. He previously had worked as a policeman in Alabama. Because Mr. Rinehart had two years' law enforcement experience, the Wayne County Sheriff's Department would

---

5. Ms. Wilson testified at trial, "When you go through something like that once and it doesn't work ... when you fight and it does not work ... you don't feel like fighting again." She explained further that she did not resist because the sheriff was "in a position of authority."

6. The grand jury did not indict Sheriff Nutt.

7. William Kropf was first hired in November 1991; he was dropped from the payroll in May,

1992, and re-hired in early July, 1992. Chad Balentine and Julie Norris both were hired in March 1992. Mary Bolitho was hired in May, 1992. Kenny Nutt was hired in July, 1992. Also, Jeff Gray was hired as a dispatcher in February, 1992; his title was changed to "TAC dispatcher" in June, 1992. *See* defendant's exhibit D–1. The evidence does not explain the difference between a "TAC dispatcher" and an ordinary "dispatcher."

be eligible for a $5,000 grant towards his salary if Mr. Rinehart were to become a certified Tennessee law enforcement officer. The grant would be provided by the "D.A.R.E." (Drug Abuse Resistance and Education) program. Mr. Rinehart passed his certification exam on July 31, 1992. *See id.* In mid-August, Mr. Rinehart was added to the sheriff's department payroll as a deputy sheriff. His annual salary is $13,000. In accordance with the D.A.R.E. program, much of Mr. Rinehart's work is devoted to lecturing schoolchildren about drugs.

## II. Conclusions of Law.

### A. Sexual Harassment under Title VII.

■ Title VII of the Civil Rights Act of 1964 provides that "it shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). When a supervisor sexually harasses a subordinate because of her sex, the supervisor violates Title VII. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49, 58 (1986).

■ Courts recognize two kinds of sexual harassment prohibited by Title VII: 1) the "hostile work environment" and 2) the "quid pro quo." *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 182 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992). The first is found where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301 (1993). The second arises when "submission to ... unwelcomed sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or ... a tangible job detriment resulted from the employer's failure to submit to the sexual demands of supervisory employees." *Highlander v. K.F.C. Nat'l Management Co.,* 805 F.2d 644, 648 (6th Cir.1986). "[T]he trier of fact must determine the existence of sexual harassment in light of 'the record as a whole' and 'the

totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Vinson,* 477 U.S. at 69, 106 S.Ct. at 2406, 91 L.Ed.2d at 61 (quoting 29 C.F.R. § 1604.11(b) (1985)).

In the instant action, the Court concludes that Sheriff Nutt subjected Wendy Wilson to both hostile environment and quid pro quo sexual harassment.

### 1) Hostile Environment.

■ By luring Ms. Wilson into his office in the dead of night, locking off her only route of escape, fondling her, placing her hand on his crotch, and physically pulling her to the floor to have sexual relations, Sheriff Nutt created an extremely hostile work environment. Indeed, his actions on the morning of July 13 were so intimidating and abusive to Ms. Wilson as to constitute a constructive discharge from employment. *See Yates v. Avco Corp.,* 819 F.2d 630, 636–38 (6th Cir. 1987) ("A constructive discharge exists if 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have been compelled to resign.'").

Sheriff Nutt contends that the evidence does not support finding a hostile environment because Ms. Wilson never indicated to him that his sexual advances were unwelcome. He further argues that he reasonably believed his advances would be well-received on the basis of Ms. Wilson's demeanor at work. To support these arguments, the sheriff relies on the Supreme Court's opinion in *Vinson,* wherein the Court stated: "The correct inquiry is whether respondent *by her conduct indicated* that the alleged sexual advances were unwelcome...." 477 U.S. at 68, 106 S.Ct. at 2406, 91 L.Ed.2d at 60 (emphasis added).

Contrary to the sheriff's contentions, the evidence does support the Court's finding that Ms. Wilson manifested displeasure at his advances. Specifically, Ms. Wilson refused to reciprocate his fondling of her, even after he tried putting her hand on his own crotch, and she refused his direction to get on the floor. At the latest, when the sheriff had to

physically pull Ms. Wilson to the floor to achieve his objective, it should have been apparent to him that his advances were unwelcome. Nor did Ms. Wilson's comportment at work indicate that she would welcome any advances by Sheriff Nutt. The fact that an eighteen-year-old girl wore shorts during the summer months in Tennessee, wore a bathing suit on a canoe trip, and engaged in non-sexual horseplay with a co-worker her own age should not be perceived by even the most optimistic fifty-three-year-old man as a willingness to have sex with him. Likewise, the fact that Ms. Wilson had sex with Mr. Burns did not indicate her desire to have sex with Sheriff Nutt.

*2) Quid Pro Quo.*

 Sheriff Nutt subjected Ms. Wilson to quid pro quo harassment by making submission to his unwelcome sexual advances a condition to continued employment at the sheriff's department. Only a few days before the events of July 13, Ms. Wilson had asked Sheriff Nutt if she could stay on as a dispatcher in the fall, and he responded that he would "think about it." Minutes after she raised the issue again, the sheriff called her into his office for sex. The Court concludes that Sheriff Nutt had made submission to his sexual advances the test for whether Ms. Wilson would stay on as a dispatcher. As such, he subjected her to the classic form of quid pro quo harassment by conditioning a job benefit on submission to unwelcome sexual advances. *See Highlander,* 805 F.2d at 648.

Ms. Wilson admits that the sheriff never explicitly offered her continued employment in exchange for sexual favors. In fact, her lawyer disclaims that Ms. Wilson even understood that the sheriff might be conditioning her continued employment on what would happen on the floor of his office. The Court, however, concludes that these points are irrelevant. According to the United States Court of Appeals for the Sixth Circuit, a plaintiff may prove quid pro quo harassment by showing that submission to unwelcome sexual advances was "an express *or implied* condition for receiving job benefits." *Id.* (emphasis added). Ms. Wilson may not have

realized what the conditions were for her to stay on as a dispatcher, but this Court is not so naive. The Court concludes that Sheriff Nutt conditioned Ms. Wilson's continued employment on her submission to his sexual advances, and, in so doing, he violated the law.

*B. Retaliatory Discharge under Title VII.*

 Title VII also makes it unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a). To make out a prima facie case under this provision a plaintiff must prove three elements: (1) he opposed an unlawful employment practice; (2) he was subsequently subjected by his employer to an adverse employment action; and (3) a causal link existed between the first two elements. *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987). A close proximity between the opposition and the adverse employment action is evidence of a "causal link." *Wrenn v. Gould,* 808 F.2d 493, 501 (6th Cir.1987). If the employer puts forward a legitimate reason for the adverse employment action, then the plaintiff must demonstrate that the proffered reason was merely a pretext for retaliation. *Id.*

 The Court concludes that Sheriff Nutt fired Mr. Burns in retaliation for opposing the sheriff's harassment of Ms. Wilson. Among the actions that Deputy Burns took in opposition to the harassment were the following: he notified an assistant district attorney of Ms. Wilson's allegations; he procured a rape-detection-kit; he contacted a sheriff's department sergeant; he took Ms. Wilson to the hospital for an examination; and he testified before the Wayne County Grand Jury. Courts consider a wide variety of activities as constituting "opposition" under the anti-retaliation provision of Title VII. *Coleman v. Wayne State Univ.,* 664 F.Supp. 1082, 1092 (E.D.Mich.1987). Forms of protected opposition include publicly and privately expressing that an employer has illegally discriminated, *id.* reporting illegal discrimination to supervisors, *Jenkins v. Orkin*

*Exterminating Co.,* 646 F.Supp. 1274 (E.D.Tex.1986), and testifying in court about illegal discrimination. *Truelove v. Trustees of Univ. of D.C.,* 744 F.Supp. 307, 313 (D.D.C.1990). Mr. Burns's actions on behalf of Ms. Wilson fall within the realm of protected opposition.

The Court rejects as pure pretext Sheriff Nutt's explanation that he laid off Mr. Burns because of budget restrictions. Not only was Mr. Burns the only employee that the sheriff found to be too costly during the summer of 1992, but the sheriff proceeded to add Tom Rinehart to the payroll within a month after laying off Mr. Burns. Even considering that some of Mr. Rinehart's salary is paid by a third party, the Court is unable to reconcile his hiring so soon after the lay-off of Mr. Burns as anything other than proof that the latter's termination was not based on financial considerations. This conclusion is further buttressed by the fact that Sheriff Nutt previously had assured Mr. Burns that Mr. Rinehart's arrival would not affect his own job and had even told Mr. Burns to "get his papers ready" to go to the Law Enforcement Academy in August or September. Finally, Sheriff Nutt has failed to explain why he singled out Mr. Burns as the solution to the alleged financial difficulties of the sheriff's department. There were numerous junior employees working as dispatchers, but the sheriff never offered Mr. Burns the option of staying on in that capacity, even though Mr. Burns was an experienced dispatcher. The sole conclusion that the Court draws from these facts is that Sheriff Nutt fired Mr. Burns in retaliation for opposing his harassment of Ms. Wilson.

### C. Individual Liability under Title VII.

■ Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees ... *and any agent of such a person....*" 42 U.S.C. § 2000e(b) (emphasis added). This definition has caused much difficulty for courts confronting the question of whether individual agents may be personally liable for discriminatory acts they commit on the job.

The greatest weight of recent authority concludes that there is no individual liability under Title VII. *E.g., Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993); *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587–88 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994); *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991) (per curiam); *Harvey v. Blake,* 913 F.2d 226, 227–28 (5th Cir.1990); *Lowry v. Clark,* 843 F.Supp. 228, 229–31 (E.D.Ky.1994); *Johnson v. Northern Ind. Pub. Serv. Comm'n,* 844 F.Supp. 466, 468–70 (N.D.Ind.1994); *Dirksen v. City of Springfield,* 842 F.Supp. 1117, 1122 (C.D.Ill.1994); *Henry v. E.G. & G. Mo. Metals Shaping Co.,* 837 F.Supp. 312, 314 (E.D.Mo.1993); *Roos v. Smith,* 837 F.Supp. 803, 806 (S.D.Miss.1993); *Stafford v. Missouri,* 835 F.Supp. 1136, 1149 (W.D.Mo.1993); *Pelech v. Klaff-Joss L.P.,* 828 F.Supp. 525, 529 (N.D.Ill.1993) (Aspen, J.); *Jenkins v. City of Grenada,* 813 F.Supp. 443, 447 (N.D.Miss.1993). However, some courts continue to hold to the contrary. *E.g., Lamirande v. Resolution Trust Corp.,* 834 F.Supp. 526, 528 (D.N.H.1993); *Raiser v. O'Shaughnessy,* 830 F.Supp. 1134, 1137 (N.D.Ill.1993) (Moran, J.); *Wilson v. Gillis Advertising Co.,* 61 Emp.Prac.Dec. (CCH) 42,245, 1993 WL 503117 (N.D.Ala.1993); *Bridges v. Eastman Kodak Co.,* 800 F.Supp. 1172, 1179–80 (S.D.N.Y.1992); *see also Paroline v. Unisys Corp.,* 879 F.2d 100, 106 (4th Cir.1989), *vacated in part on other grounds,* 900 F.2d 27 (4th Cir.1990) (en banc) (supervisor may be liable as an "employer"); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 n. 1 (11th Cir.1989) (supervisor may be *"directly* liable for his actions that violate Title VII"); Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law,* ch. 23 (1992) (individual liability exists where there is substantial personal involvement by agent in discriminatory conduct.)

Those cases cited above which deny the existence of individual liability have distinguished between an agent's liability in his "official capacity" as agent of the employer and his liability in his "individual capacity." In so doing, they borrow from the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983, which construes "official capacity" suits as proceeding against the government entity which the individual defen-

dant serves, rather than against the individual defendant personally in his "individual capacity." *See Kentucky v. Graham,* 473 U.S. 159, 165–68, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114, 121–23 (1985). These courts assert that the phrase "and any agent" in Title VII's definition of "employer" means agents in their "official capacities" as representatives of employers. They support this construction by pointing out that Title VII, as it was originally enacted, only permitted equitable relief, which is generally appropriate against employers, but not their agents.

Those courts taking the opposite view rely on the plain language of Title VII's definition of "employer," which includes "any agent" of the employer, without reference to "individual" or "official" capacity. They also point out that the Civil Rights Act of 1991 expanded the remedies available under Title VII to include compensatory damages, *see* 42 U.S.C. § 1981a(a)(1), which may properly be levied against individual defendants. Finally, they cite the broad remedial purpose of Title VII as calling for a liberal construction of "employer."

The Court of Appeals for the Sixth Circuit has not directly addressed this issue, and its opinions provide little guidance. In one case, the Court observed in dictum that a supervisory employee could have been "sued in his *official capacity* as executive director, i.e., agent, of the [defendant] association provided the association was the employer of [the requisite number of] persons." *York v. Tennessee Crushed Stone Ass'n,* 684 F.2d 360, 362

(6th Cir.1982) (emphasis added). However, the Court concluded that the association did not employ the requisite number of persons and never explained what it meant by the phrase "official capacity."[8] In a later opinion in which the Court of Appeals was deciding whether it had been "unreasonable and vexatious" for purposes of assessing attorney's fees under 28 U.S.C. § 1927 to sue an individual defendant under Title VII, the court said: "[T]he law is clear that individuals may be held liable ... as 'agents' of an employer under Title VII. Since the individual employees were at least arguably 'agents' of the employer, we think it obvious that Jones's counsel were intentionally and properly seeking recovery against the individuals under [Title VII]." *Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986) (citations omitted). *See also Yates v. Avco Corp.,* 819 F.2d 630, 633 (6th Cir.1987) (noting that individual defendant did not appeal judgment against him); *Romain v. Kurek,* 772 F.2d 281, 283 (6th Cir.1985) (individual defendant who was not named in EEOC charge should not have been dismissed if there was an "identity of interest" between him and corporate defendant; caption lists individual defendant as being sued "individually and in combination with [corporate defendant], jointly and severally").

Some district courts in the Sixth Circuit have squarely held that individual agents may only be sued under Title VII in their official capacities. In *Lowry v. Clark,* 843 F.Supp. 228 (E.D.Ky.1994), the court entered

---

**8.** One of the cases on which the Court of Appeals relied in its observation that individuals may be sued under Title VII in their "official capacities" specifically rejected the official/individual capacity distinction. In that case, the district court stated:

> Whether such [discriminatory acts] took place as a private person or as an officer is of no import here. Title VII actions do not contain "under color of state law" problems associated with Section 1983 actions. If the person against whom the complaint is filed is within the definition of "employer," his capacity during the alleged discriminatory events is irrelevant, so long as the alleged discrimination relates to employment.

*Kelly v. Richland School Dist. 2,* 463 F.Supp. 216, 218 (D.S.C.1978) (citation omitted). Even the *Kelly* court, however, seems somewhat confused about the relevance of the official/individu-

al capacity distinction in Section 1983 litigation. In a Section 1983 action the defendant's "capacity" has nothing to do with the question of whether he was acting under color of state law when he committed the alleged illegal act. Rather, it concerns the manner in which the plaintiff pleads her lawsuit. If she sues a defendant in his individual capacity, she seeks to recover from him personally. If she sues him in his official capacity, she asserts a right to relief against the governmental entity the defendant serves. *See Kentucky Graham,* 473 U.S. at 165–68, 105 S.Ct. at 3105–06, 87 L.Ed.2d at 121–23.

Considering the obiter dictum context of the Court of Appeals' statement and the confusing authority on which it relied, *York* does not seem a proper authority for the proposition that individuals may not be sued under Title VII in their individual capacities.

summary judgment for an individual defendant on the grounds that the plaintiff had settled with the corporate defendant, thereby vitiating her claim against the individual defendant. Likewise, in *Babb v. Bridgestone,* No. 3–92–0695 (M.D.Tenn. February 23, 1993), and *Brasfield v. Tennessee Alcoholic Beverage Comm'n,* No. 3–92–0873 (M.D.Tenn. March 9, 1993), Judge Wiseman dismissed claims against the individual defendants in their individual capacities on the grounds that Title VII only permitted them to be sued in their official capacities. *See also Williams v. Hevi–Duty Elec. Co.,* 668 F.Supp. 1062, 1070 (M.D.Tenn.1986) (Morton, J.), *rev'd on other grounds,* 819 F.2d 620 (6th Cir.), *cert. denied,* 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 406 (1987) (individual defendant is not Title VII "employer" because the "employer ... is the one against whom affirmative relief, including backpay, may be adjudged"). In at least one reported decision, a district court in this circuit has entered a judgment against an individual defendant. *Compston v. Borden, Inc.,* 424 F.Supp. 157, 163 (S.D.Ohio 1976). Still others have refused to dismiss individual defendants without commenting whether they might be liable in their individual or official capacities. *E.g., Fauser v. Memphis Housing Auth.,* 780 F.Supp. 1168 (W.D.Tenn.1991); *Robson v. Eva's Super Market, Inc.,* 538 F.Supp. 857, 863 (N.D.Ohio 1982); *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich. 1977).

This Court thinks it makes little sense, in the context of Title VII, to speak of suits against individuals in their "official" or "individual" capacities. Identifying the capacity of an individual defendant is only relevant in suits against public officials presenting certain issues of Eleventh Amendment immunity,[9] official immunity,[10] or government liability for acts of government agents.[11] *See Kentucky v. Graham,* 473 U.S. at 165–68, 105 S.Ct. at 3105–06, 87 L.Ed.2d at 121–123. However, these issues are largely irrelevant in Title VII litigation.

First, the Eleventh Amendment is never a bar to Title VII actions. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Title VII was enacted pursuant to the Fourteenth Amendment, and therefore it trumps state immunity. *Id.*

Second, it would be extremely difficult for any Title VII defendant to successfully assert a defense of official immunity. In most cases, Title VII defendants are private employers, and there is simply no basis for an official immunity defense. In the narrow class of cases in which the defendant is a public official asserting official immunity, the official would have to demonstrate an objectively reasonable belief that his discriminatory actions did not violate clearly established law. *See Harlow v. Fitzgerald,* 457 U.S. 800, 817–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410–11 (1982).[12] But the likelihood of ever

9. The Eleventh Amendment forbids suits for money damages against state officials in their *official* capacities. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662, 672–73 (1974). However, it does not bar such suits against state officials in their *individual* capacities. *Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90, 97–98 (1974); *Foulks v. Ohio Dept. of Rehabilitation and Correction.,* 713 F.2d 1229, 1233 (6th Cir.1983).

10. When a government official is sued in his *individual capacity,* he is protected by a qualified immunity from liability based on his actions that do not violate clearly established law. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). However, when he is sued in his *official capacity,* the suit is construed as one against the government entity itself, and no qualified immunity defense is

available. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

11. For example, in a Section 1983 action, a municipality is not vicariously liable for the constitutional torts of its employees because Section 1983 does not recognize respondeat superior. *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611, 636–38 (1978). Therefore, in a suit for money damages against a municipal officer in his *individual capacity,* the plaintiff may only recover from the officer and not the municipality he serves. On the other hand, if the plaintiff sues the officer in his *official capacity,* the suit is really one against the municipality, and recovery may not be had from the officer.

12. The Supreme Court has never decided whether the official immunity defense is applicable in a Title VII action. However, the Court took a dim view of an employer's asserting the equitable defense of "good faith":

succeeding on such a theory is minimal because Title VII's prohibition against discrimination in employment is a law "of which any reasonable public official would be well aware." *Fauser v. Memphis Housing Auth.*, 780 F.Supp. 1168, 1174 (W.D.Tenn.1991). *But see Hutchison v. Lake Oswego School Dist. No. 7*, 519 F.2d 961 (9th Cir.1975), *vacated on other grounds*, 429 U.S. 1033, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977) (school officials entitled to official immunity despite having violated Title VII by denying sick leave to pregnant teacher). In any event, it seems a drastic and unfounded rule to eliminate liability of *all* individual Title VII defendants, private persons and public officials alike, on the grounds that a few public officials might successfully assert official immunity.

Third, Title VII does hold government entities, as well as private employers, liable for the discriminatory acts of their agents. *See Fitzpatrick v. Bitzer*, 427 U.S. at 456–57, 96 S.Ct. at 2671–72, 49 L.Ed.2d at 622 (state liable for backpay and attorney's fees for Title VII violations by state officials). In this respect, Title VII differs significantly from Section 1983, which does not recognize vicarious liability of government entities. *See supra* note 11.

The Supreme Court has stated that "Congress wanted courts to look to agency principles for guidance" in assigning liability for sexual harassment by employers' agents, *Vinson*, 477 U.S. at 72, 106 S.Ct. at 2408, 91 L.Ed.2d at 63, and the Court referred generally to the *Restatement (Second) of Agency* for elaboration of agency principles, *id.* Accordingly, the Court of Appeals for the Sixth Circuit has relied on the *Restatement* in de-

ciding when an employer is liable under Title VII for sexual harassment by its supervisory personnel. *Kauffman*, 970 F.2d at 184; *Yates v. Avco*, 819 F.2d at 630. As noted above, the Court of Appeals has not yet addressed the issue of whether the agent himself can ever be personally liable, but the law of agency suggests that he can be. The *Restatement* provides: "Principal and agent can be joined in one action for a wrong resulting from the tortious conduct of an agent . . ., and a judgment can be rendered against each." *Restatement (Second) of Agency* § 359C(1) (1957). Furthermore, if a plaintiff settles her claim against the principal but reserves her rights against the agent, the agent is not released from liability but is only entitled to a set-off of amounts paid by the principal. *Id.* § 359B(a); *see also* cases cited in *id.* Appendix.[13]

This Court finds much of the analysis used by other courts in concluding that there is no individual liability under Title VII to be questionable. Principally, the distinction between defendants being sued in their "official" and "individual" capacities seems misplaced in the Title VII context. Furthermore, the law of agency, on which courts have relied to determine employer liability for sexual harassment by the employer's agents, suggests that the agents themselves should liable.

Nevertheless, this Court cannot ignore what is obvious. The greatest weight of recent legal authority, including the holdings of the courts of appeals of other circuits, other district courts in this circuit, and even other judges within this district, does not

---

Where an employer *has* shown bad faith—by maintaining a practice which he knew to be illegal or of highly questionable legality—he can make no claims whatsoever on the Chancellor's conscience. But, under Title VII, the mere absence of bad faith simply opens the door to equity; it does not depress the scales in the employer's favor. . . . Title VII is not concerned with the employer's "good intent or absence of discriminatory intent" for "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation."
*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280, 299 (1975) (emphasis in original) (citations omitted).

**13.** Following the settlement of claims against Wayne County and the Wayne County Sheriff's Department, Sheriff Nutt moved to have this action dismissed as to him on the grounds that agency law requires release of the agent upon release of the principal. *See* Memorandum (filed October 7, 1993; Docket Entry No. 59) in support of motion to dismiss at 2–3. The Court rejected the sheriff's argument as a misstatement of agency law. *See* Memorandum (entered December 2, 1993; Docket Entry No. 85). Sheriff Nutt never brought to the Court's attention the line of cases discussed above which hold that individuals may not be sued in their individual capacity under Title VII.

recognize individual liability for Title VII violations. Without a clear statement to the contrary from the United States Court of Appeals for the Sixth Circuit or the United States Supreme Court, this Court concludes that Title VII does not permit suits against individual defendants in their "individual capacities." Therefore, this action shall be dismissed with prejudice.

### III. Conclusion.

For the reasons set forth above, this action shall be dismissed with prejudice.

An appropriate order shall be entered.